UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARÍA ELENA SWETT URQUIETA,

                              Petitioner,

                -v-

JOHN FRANCIS BOWE,

                              Respondent.

---

24 Civ. 1379 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a petition for the return of a child, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986) ("Hague Convention") and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 *et seq.*

Petitioner María Elena Swett Urquieta ("Swett")[1] petitions for the return of her son, S.B.S., age 11, to Chile. Swett, a Chilean actress, and respondent John Francis Bowe ("Bowe"), an American writer, met in Brazil in 2010 and began a long-distance, romantic relationship. On June 27, 2012, their child, S.B.S., was born in Minnesota. Shortly after, the couple split up. In a family court order entered in Minnesota and adopted by a Chilean court, Swett and Bowe agreed that Swett would have sole physical custody of S.B.S. in Chile; that Swett and Bowe would share legal custody; that Bowe would be permitted to visit S.B.S.; and that S.B.S. could visit Bowe in New York City, for about 90 days every year, pursuant to travel authorizations granted by Swett.

---

[1] In Chile, a person typically has two surnames—the first being their father's, and the second being their mother's. The standard practice in Chile is to use a person's first surname when referring to her in shorthand. The Court follows that here and refers to petitioner as "Swett."

That custody arrangement was honored until 2022.  In mid-2022, Bowe noticed a dramatic shift in S.B.S.'s mood and affect.  S.B.S. was persistently depressed, referenced suicide, and on one occasion purposefully dug his nails so deep into his arm as to draw blood.  Swett, alerted to these circumstances, had not engaged professional help or otherwise meaningfully responded.  Bowe concluded that S.B.S.'s living situation in Chile was the source of his anguish and depression.  On December 23, 2022, S.B.S., accompanied by Bowe, left Chile for an authorized Christmas holiday visit to the United States.  Fearful that S.B.S.'s despair would continue if not deepen in Chile, Bowe decided not to return S.B.S. on January 8, 2023, the expiration date of S.B.S.'s authorized travel to the United States.  On February 23, 2024, Swett filed the instant petition seeking S.B.S.'s return.  Between April 8 and 19, 2024, the Court held a bench trial on Swett's petition.

For the reasons that follow, the Court denies Swett's petition for return of S.B.S. to Chile.

## I.      Procedural History

On February 23, 2024, Swett petitioned for S.B.S.'s return to Chile (the "Petition"), Dkt. 1, and filed a declaration in support, Dkt. 4.  On February 27, the Court issued an order to show cause, in which it set a hearing, and ordered that Swett serve Bowe with the order and underlying papers by February 28, that Bowe deposit S.B.S.'s travel documents with the Clerk of Court for safekeeping, and that S.B.S. not be removed from this jurisdiction during this litigation.[2]  Dkt. 6.

---

[2] The Court later permitted S.B.S. to travel to the Eastern District of New York, Dkt. 40, to leave the state for a field trip, and to visit an ailing grandparent, Dkt. 79.

On March 4, the Court held a conference and discussed appointment of counsel for S.B.S. Dkt. 40 at 43–44. The next day, the Court appointed Jennifer Baum, Esq., a professor at St. John's University School of Law, as independent counsel for S.B.S. Dkt. 17.[3]

On March 13, Bowe responded to the Petition, conceding that Swett had established a *prima facie* case that he had wrongfully retained S.B.S. in the United States, but asserting three affirmative defenses: that S.B.S. (1) is well-settled in the United States; (2) objects to being returned, and is of a sufficient age and maturity for his views to be taken into account; and (3) faces a grave risk of harm if returned to Chile. Dkt. 29. On March 20, the Court held a conference and set a pretrial and trial schedule. Dkt. 61.

On March 21, Swett filed an Amended Petition, Dkt. 33, and a declaration in support, Dkt. 34. It identified ameliorative measures Swett proposed to implement in Chile were S.B.S. returned. These included hiring a therapist, arranging for private tutoring, and enrolling S.B.S. in extracurricular activities. On April 4, the Court held a final pretrial conference. On April 5, the parties submitted proposed findings of fact and conclusions of law. Dkts. 64, 68.

Between April 8 and April 19, the Court conducted a bench trial. Agreeing that the case turned on Bowe's affirmative defenses, the parties proposed and the Court agreed that Bowe would present his case first. As witnesses, Bowe called: (1) himself; (2) Marisa Bowe, Bowe's sister; (3) Sonia Bowe-Gutman, Bowe's mother; (4) Michele Trauman, S.B.S.'s fifth-grade teacher at P.S. 41 in New York City; (5) Kimberly Daniels, a school counselor at P.S. 41; (6) Shauna Lyon, mother of S.B.S.'s best friend in New York; (7) William Clegg, S.B.S.'s godfather in the United States; and (8) Dr. Ilana Attie, S.B.S.'s treating psychologist in New

---

[3] On March 7, the Court referred the case to Magistrate Judge Robert W. Lehrburger for the purpose of facilitating settlement discussions. Dkt. 21. These discussions proved unsuccessful.

York.[4] Swett called: (1) herself; (2) Guillermo Swett, Swett's father; (3) Sonia Tolosa, mother of S.B.S.'s best friend in Chile; (4) Dr. Ana Maria Gomez, S.B.S.'s pediatrician in Chile; (5) Maria Jose Salazar Carter, Swett's friend and coworker; (6) Maria Teresa Alarcon, S.B.S.'s home-room teacher in Chile; (7) Hector Morales, S.B.S.'s godfather in Chile; and (8) Dr. Peter Favaro, a forensic psychologist whom Swett retained as an expert witness. On April 15, the Court heard extended *in camera* testimony from S.B.S., in which the Court—guided by questions proposed by counsel for the parties and S.B.S.—questioned S.B.S. The Court also received voluminous documentary evidence. It largely consisted of messages exchanged over Skype between Bowe and S.B.S., messages exchanged over WhatsApp and email between Bowe and Swett, audio recordings and transcripts of Skype calls between Swett and S.B.S., contemporaneous notes taken by S.B.S.'s treating psychologist in New York, photographs, and videos. The Court also received a detailed summary of S.B.S.'s perspective prepared by Ms. Baum in advance of trial, Dkt. 56, Ex. 1 ("S.B.S. Summary"), which S.B.S. adopted in his testimony, Tr. 987–88.

## II.    Applicable Law

The Hague Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Golan v. Saada*, 596 U.S. 666, 670 (2022) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)). One hundred countries, including the United States and Chile, have ratified the Convention. The Convention's purpose, per its preamble, is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." The Convention's "core premise" is that "the

---

[4] For clarity, the Court refers to Bowe's mother, Sonia Bowe-Gutman, and sister, Marisa Bowe, by their first names.

interests of children . . . in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (internal quotation marks omitted). As such, "the Convention generally requires the 'prompt return' of a child to the child's country of habitual residence when the child has been wrongfully removed to or retained in another country." *Golan*, 596 U.S. at 670 (citing Hague Convention, arts. 1(a), 12). This requirement "ensure[s] that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1(b).

To implement the Convention, Congress, in 1988, enacted ICARA. Under ICARA, a parent seeking relief under the Convention may petition for return of a child in federal or state court. 28 U.S.C. § 9003(a)–(b). ICARA directs courts to "decide the[se] case[s] in accordance with the Convention." *Id.* § 9003(d). Consistent with the Convention, ICARA "empower[s] courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." *Id.* § 9001(b)(4); *see* Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."). The Convention recommends that hearings be conducted expeditiously and petitions resolved, if possible, within six weeks of their filing. *Id.* art. 11.

A petitioner who establishes wrongful removal or retention by a preponderance of the evidence has made out a *prima facie* case under ICARA. *In re D.T.J.*, 956 F. Supp. 2d 523, 528 (S.D.N.Y. 2013). Removal or retention of a child is wrongful when "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual

residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005).

Once a petitioner establishes a *prima facie* case, ICARA requires that the child be repatriated for custody proceedings unless the respondent can make out one of the Convention's "narrow" affirmative defenses. 22 U.S.C. §§ 9001(a)(4), 9003(e)(2). These include the three that Bowe asserts: that (1) the child objects to being returned and is of sufficient age and maturity for his views to be taken into account, Hague Convention, art. 13; (2) the petitioner commenced the proceeding more than a year after the child's wrongful removal or retention and the child has become well-settled in his new environment, *id.* art. 12; and (3) returning the child would pose a "grave risk" to his physical or psychological well-being or place him "in an intolerable situation," *id.* art. 13(b). The first two defenses must be established by a preponderance of the evidence. *See* 22 U.S.C. § 9003(e)(2)(B). The third must be established by clear and convincing evidence. *See id.* § 9003(e)(2)(A).

The defenses "do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody." *In re D.T.J.*, 956 F. Supp. 2d at 529. Even where a defense has been established, "it remains within the discretion of a court whether to allow the child to remain with the abducting parent or to order repatriation." *Id.*

## III.   Credibility Determinations

Where based in whole or in part on a witness's testimony, the Court's findings reflect credibility determinations based on its assessment of, *inter alia*, the relevant witness's demeanor, bias, and the extent to which the testimony was inherently logical and consistent with the testimony of other witnesses and relevant documentary evidence.

As a general matter, the Court found most testimony credible. In particular, the Court found highly credible the testimony of Dr. Attie, S.B.S.'s treating psychologist in New York; Trauman, his teacher at P.S. 41; Daniels, his school counselor at P.S. 41; Dr. Gomez, his pediatrician in Chile; and Alarcon, his teacher in Chile. These witnesses impressed the Court as dedicated professionals with a commitment to S.B.S.'s best interests and as rigorously careful reporters. Among the parties, Bowe and Swett each impressed the Court as an adoring parent genuinely motivated by love for S.B.S. Each parent's testimony contained substantial credible components. But the Court found discrete aspects of each parent's testimony problematic and seemingly motivated by his or her interests in this proceeding. Bowe gratuitously attacked Swett's character and overstated her parental deficiencies. Although Bowe was rightly alarmed and moved to act by S.B.S.'s depressive words and affect, Bowe's repeated description of S.B.S. as actually suicidal did not align with the evidence. Swett was more consistently credible, but her testimony was not reliable on some central matters, including when S.B.S. first projected depression in Chile and the extent to which such was visible to her. For both parents, the Court's credibility determinations largely turned on the extent to which the testimony was corroborated by other evidence. The remaining fact witnesses were broadly credible in recounting anecdotes and impressions, with the caveat that some family members' testimony, particularly concerning the opposing parent, projected as motivated by interest and/or antagonism. The sole expert, Dr. Favaro, added value on one point. He persuasively opined that Bowe's demeaning descriptions of Swett in Skype messages had the capacity to lower S.B.S.'s esteem and affection for his mother (and derivatively, for Chile). The Court otherwise did not find Dr. Favaro's testimony persuasive, including as to the defenses at issue. The Court evaluates S.B.S.'s testimony below, in addressing the defense based on his age and maturity.

IV.    **Findings of Fact**

The findings of fact that follow are based on the Court's review of the entire trial record. Except where otherwise indicated, where facts are recited, the Court finds the fact recited to be true. Where the Court states a witness's perspective on a point, the Court finds such to have been the witness's perspective, not that that perspective was necessarily correct. Further factual findings are contained in the ensuing Discussion section.

A.    **Background to the Events of 2022**

Swett, then 31, and Bowe, then 46, met in September 2010 in Rio de Janeiro, Brazil. PX-2 at 1.[5] Bowe, an American freelance writer, was there for work—a piece he was writing for the *New York Times Magazine*. Tr. 34 (Bowe). Swett is a Chilean actress and television personality who goes by the nickname "Mane." Tr. 530–31 (Swett). The two began to date. Because Swett knew little English, they communicated in Spanish, in which they were each fluent. Tr. 44, 87 (Bowe). After they left Brazil, they began to date long-distance, traveling back and forth from New York, where Bowe lived, and Santiago, where Swett lived. Tr. 34–35 (Bowe).

In September 2011, Swett became pregnant. Tr. 35 (Bowe), 517–18 (Swett). The pregnancy occasioned more time together for the couple—and stress. For the first time, they lived together—first in Santiago, then in New York City. Tr. 35 (Bowe). Initially, the couple planned for the child to be born in Chile. Tr. 517 (Swett). But, when Swett was five months pregnant, that plan changed. Stating that he might not be able to be in Chile for the birth, Bowe

---

[5] As used herein, "PX" and "RX" refer to exhibits offered by the petitioner and the respondent, respectively. "Tr." refers to the trial transcript—where the text does not identify the testifying witness, the name follows in parentheses. "S.B.S. Summary" refers to S.B.S.'s factual narrative and perspective which his independent counsel, Ms. Baum, prepared in collaboration with him and which S.B.S. adopted during his testimony. *See* Dkt. 56; Tr. 987–88. When quoting from exhibits, the Court does not note or correct spelling, punctuation, or typographical errors.

suggested that Swett give birth in the United States—in Minneapolis, his hometown, where his family lived.  Tr. 34 (Bowe), 517–18 (Swett).  Swett agreed, and on June 27, 2012, S.B.S. was born in Minnesota.  Tr. 35 (Swett).

The pregnancy put further strain on Bowe and Swett's relationship.  Bowe, Swett, and newborn S.B.S. were living together in an apartment in Minneapolis—in the same building as Bowe's mother, Sonia, also a fluent Spanish speaker.  Tr. 397 (Sonia).  Soon after S.B.S. was born, Swett—the family's primary earner—renewed her contract with one of Chile's largest television stations, requiring her to return to Santiago to start work in January 2013.  Tr. 518–19 (Swett).  She planned to return to Chile with S.B.S. and Bowe, and made arrangements to ensure the move would occasion as little disruption as possible.  She found a new apartment with "a really nice office for the writer," arranged health insurance, and scheduled their travel to Santiago.  Tr. 519–20 (Swett).

In late December 2012, Bowe and Swett's relationship came to an abrupt end when he filed suit against her in a family court in Minnesota, seeking sole physical and legal custody of S.B.S., then six months old.  Tr. 36 (Bowe), 852–53 (Swett).  This came as a "shock" to Swett, to whom Bowe had not given advance notice of the lawsuit, and who had thought that Bowe—with whom she was living—had agreed to move with her and S.B.S. to Chile the following week.  Tr. 519–20, 852–53 (Swett).  Bowe's legal filings personally attacked Swett.  PX-1.  They depicted Swett as irresponsible—reliant on "Prozac and other drugs," plus cigarettes and alcohol, "before and during most of the pregnancy," *id.* at 5—and immature—unable to "grind" in the day-to-day, but "able to muster the energy needed to go to a Madonna concert," *id.* at 8, and to go "out on the town with her English instructor until the wee hours of the morning," *id.* at 11.

9

Within days, Swett retained counsel, and cross-moved for authorization to return to Chile.  PX-2 at 4.

After an expedited hearing, the family court held with Swett.  It denied Bowe's motion and granted Swett's cross-motion.  *Id.* at 4.  In factual findings, the court stated it was "troubled" by Bowe's admission on the stand that "several of the allegations in his affidavit . . . were inaccurate or taken out of context." *Id.* at 3.  Bowe admitted, for example, that he was "not sure" whether Swett took certain medication, and that he had in fact encouraged Swett to go to a concert "as a means of getting out of the house and socializing." *Id.*  "These admissions," the court stated, "raise credibility concerns." *Id.*  Ultimately, the court found that "both parents are capable of providing love, support, and guidance to" S.B.S. *Id.*  But, it held, S.B.S.'s best interests required that Swett have sole physical custody, with "reasonable and liberal parenting time" afforded to Bowe. *Id.* at 4.  Soon after, Swett and S.B.S., a dual citizen of Chile and the United States, left Minnesota for good.

In early 2013, custody matters were settled when Swett and Bowe stipulated to a custody order.  PX-40 ("Minn. Custody Order").  Under it, Swett was granted sole physical custody over S.B.S. and given permission to "establish a residence for herself and S.B.S. in Chile." *Id.* at 4.  She and Bowe had joint legal custody over S.B.S. "to cooperatively make major decisions on behalf of S.B.S. with respect to education, health, and spirituality." *Id.*  Bowe, in turn, was granted "unrestricted parenting time with S.B.S. [for] a minimum of 90 days/nights per year." *Id.* at 6–7.  Bowe was required to "obtain written authorization" from Swett before traveling with S.B.S. outside Chile.  PX-40 at 7.  The custody order was entered in Minnesota and later registered in Chile.  PX-41.

Between 2013 and 2020, S.B.S.'s life in Chile, and S.B.S.'s relationship with Bowe, followed a relatively steady pattern. For the first few years of S.B.S.'s life, Bowe would visit Chile each year—typically for between one to three weeks—to spend time with S.B.S. Tr. 40 (Bowe). Once S.B.S. started school, a more frequent annual pattern of visits developed. Bowe continued to visit Chile several times a year for a few weeks at a time. Tr. 39–41 (Bowe). And S.B.S. started to spend time with Bowe in the United States. During S.B.S.'s winter (July) and summer (late December to early March) vacations, he would stay with Bowe in his New York City apartment. Tr. 41–42 (Bowe). Swett would join Bowe and S.B.S. in New York for Christmas—celebrating together—and then return to Chile to resume work. Tr. 41–42 (Bowe). Consistent with the custody order, whenever Bowe traveled with S.B.S. outside Chile, Swett would sign a notarized travel authorization. Tr. 41 (Bowe).

In March 2020, with the onset of the COVID-19 pandemic, S.B.S.'s life changed abruptly. Swett and S.B.S., then age 7 and in second grade, moved to her beach house in Tunquén, a small town about an hour and a half outside Santiago. Tr. 546 (Swett). After a month of "technological adjustments," S.B.S.'s school restarted, and was entirely online for the remainder of the Chilean school year (which runs from March to December). Tr. 536 (Swett). For five to six months, with just the two in the house, Swett took care of S.B.S. Although a cooking novice, she learned how to cook some dishes, including Chilean carbonada, and daily supervised his online schooling. Tr. 537, 540 (Swett). "[T]he hardest thing was online classes." Tr. 540 (Swett). To try and "have some fun, not just to learn," Swett and S.B.S. would upload videos to Instagram of pretend classroom skits "to encourage" the "other children that were also studying online, [and] to make them laugh." Tr. 540 (Swett). Playing make-believe with S.B.S. allowed mother and son "to turn adversity into humor." Tr. 540 (Swett).

The pandemic also interrupted the normal pattern of parental visitation.  For the first nine or so months of the pandemic, Chile was subject to severe border restrictions, such that Bowe could not enter the country.  Tr. 40–41 (Bowe).  In August 2020, Swett and S.B.S. returned to Santiago.  Tr. 542–43 (Swett).  When Chile opened its borders—around November 2020—Bowe flew to Santiago and stayed there with Swett and S.B.S. for two to three months.  Tr. 41 (Bowe).  As a result of border closures, S.B.S. could not visit New York for his annual Christmas trip, so Bowe instead came to Chile to celebrate at Swett's beach house.  Tr. 543–44 (Swett).

In 2021, S.B.S. started third grade in a new school, Colegio Presidente Errazuriz ("CPE"), a partly state-funded Catholic school in Santiago.  Tr. 473 (Tolosa), 526, 545 (Swett).  CPE is an "inclusive school" in the Chilean system, with students from different social classes and religious backgrounds.  Tr. 526–28 (Swett).  It was important to Swett that S.B.S. attend such a school, to "learn to be more tolerant" and see "the real world."  Tr. 528 (Swett).  The hope of resuming a fully in-person format, however, was foiled after two weeks, due to new COVID variants.  Tr. 545 (Swett).  Thereafter, the school year was taught via a hybrid model, with each class split into two groups, each alternating one week in person and one week online.  Tr. 545 (Swett).

## B.    S.B.S.'s Depression in 2022

During 2022, particularly during its second half, S.B.S.'s affect worsened, his mood darkened, and the relationship between Bowe and Swett became increasingly strained.  As these events led to Bowe's retention of S.B.S. in early 2023, the Court examines them in detail.

### 1.    Changes in S.B.S.'s Mood

Bowe and Swett presented starkly different narratives about S.B.S. during this period.  To Bowe, and his family, S.B.S. fell into a deep and persistent depression following the end of Bowe's visit to Santiago in May 2022.  *See, e.g.*, Tr. 46 (Bowe) (S.B.S. was "despondent" after

Bowe left, "crying and sullen and sort of flat lining," often "talking about killing himself or hurting himself or wanting to die," and even discussing particular methods of suicide with Bowe, such as "going over the balcony."). To Swett, S.B.S. was merely sad, especially after September 2022, largely from missing Bowe after his visits. *See, e.g.*, Tr. 855–56 (S.B.S.'s "sadness" from missing Bowe was "lasting longer" after each visit, and, from September onward, S.B.S. needed "a lot of consolation, a lot of support, a lot of reassurance.").

Of the evidence at trial, the most enlightening account came from S.B.S. himself. It tended to support that S.B.S. was durably and profoundly unhappy during the second half of 2022, but well short of actually suicidal. S.B.S. described his time in Chile in 2022 as lonely and unhappy. He was "in a low mood most of the time," Tr. 942, with "constant moping," Tr. 951. When he was not at school, he was at home. With Swett often away at work on acting projects, and his live-in nanny often in the kitchen or otherwise not engaged with him, S.B.S. was often left alone in his room to play video games. Tr. 889, 901. His nannies changed frequently—he recalled having had at least 20 different nannies before leaving Chile—so he "didn't get attached to them that much." Tr. 903.[6] He had two friends at school—Lautaro and Emma—but rarely saw them outside of school hours. Tr. 889. He could recall only one birthday party and two playdates with Lautaro. Tr. 889. S.B.S.'s school experience was not uplifting. He was in a class of 45 students, Tr. 913, found the classwork "hard to understand and hard to keep up [with]," and

---

[6] The number of live-in nannies whom Swett hired to serially attend to S.B.S. in Chile was a point of dispute. There was evidence that S.B.S. had had up to 32 nannies, and that a number had quit as a result of the demands of the job and/or dealing with Swett. *See, e.g.*, Tr. 43 (Bowe) (estimating 32 nannies), 902–03 (S.B.S.) (estimating 20–30 nannies). Swett testified that there had been approximately 10 nannies, Tr. 860, but told her expert, Dr. Favaro, that there had been at least 20, Tr. 1199 (Favaro). The Court finds that S.B.S. had at least 20 nannies. There is no occasion to resolve this dispute more precisely.

the quality of teaching "varied," Tr. 914. The focus, he recalled, was on "memorizing lessons," rather than on understanding the material. S.B.S. Summary ¶ 15. He did not feel unsafe, but school "always felt kind of unsupervised," Tr. 916–17, even "chaotic," S.B.S. Summary ¶ 15, and some kids would disrupt class by acting out, in particular, a child with anger issues and developmental disabilities, Tr. 916–17.

For S.B.S., weekends, with no school and his nanny off duty, were particularly lonesome. He would awaken early, around 6:30 a.m., and wait for Swett to wake up—often around midday. Tr. 904. Until then, he would play on his iPad, and order breakfast on Uber Eats, which was delivered to the door of Swett's high-rise apartment. Tr. 904–05.[7] "Because he woke up early and she slept late, there was nothing for S.B.S. to do, and no one for him to do it with." S.B.S. Summary ¶ 18. Even once Swett was awake, S.B.S. "[v]ery rarely" left the apartment on the weekends. Tr. 909. At an earlier phase in S.B.S.'s life, that had "[f]elt normal," Tr. 910, but in 2022, S.B.S. started to feel his life was "messed up," and that Chile "wasn't the right place" for him, Tr. 932–33. During this period, he told Swett, "'Mom, I want to hang out with kids,' or 'Mom, I want to have more activities.'" Tr. 936. But S.B.S. felt that nothing changed. Tr. 941. He went bike-riding with Swett rarely—perhaps once every two or three months, Tr. 889—and his main physical activity came from private Pilates classes that she arranged, which did not involve other children, S.B.S. Summary ¶ 11.

---

[7] An area of dispute was whether S.B.S. was readily able to access food in the apartment on weekend mornings before Swett awoke. Because Swett would at times sleep walk (and sleep eat), she had placed a timer and a lock on the refrigerator and pantry doors to prevent herself from accessing snacks outside certain hours. Tr. 575–76 (Swett), 905 (S.B.S.). S.B.S. could not recall whether his key was capable of overriding the timer. Tr. 905, 907. The Court finds persuasive Swett's testimony—that S.B.S.'s key could override the timer, such that he could access food when she was asleep. Tr. 577. But the Court also credits S.B.S.'s testimony that he may have lost the key during some period. Tr. 907. In all events, the Court credits that S.B.S.'s food on weekend mornings when he was alone with Swett often came via Uber Eats.

S.B.S. was particularly frustrated about the absence of his father, to whom he felt very close and with whom he spoke almost every day. *Id.* ¶ 27 (describing Bowe as "the most important and reliable person" in S.B.S.'s life). As S.B.S. testified, in Chile, "I just felt like there was a big part of me missing. . . . I just felt like I need my dad." Tr. 925. S.B.S.'s unhappiness became so bad that at one point, "[t]owards the end of 2022," in a school bathroom, he scratched his arm with his fingernails, just below the elbow, digging deep enough to draw blood. Tr. 937. That afternoon, S.B.S. came home and told Swett that he had hurt himself "because of my dad"—"[b]ecause I missed him and felt frustrated." Tr. 938. Around the same time, S.B.S. told Bowe that he wanted to kill himself. Tr. 938. Bowe "already knew that I was really unhappy," S.B.S. testified, "and I just told him once and he didn't need more reassurance." Tr. 938. By then, S.B.S. had already told Bowe several times that he "was really depressed" and that he "did not want to be in Chile anymore," to which Bowe would say, "'I'm working on it.'" Tr. 934. Notwithstanding his statement about killing himself, S.B.S. never considered taking any steps to kill himself, because, he believed that, eventually, his "dad would come" and take him to the United States. Tr. 939. S.B.S. felt he could not tell Swett that he wanted to live with Bowe permanently, because he "was scared that she'd be mad" at him. Tr. 933. In sum, as S.B.S. testified, "I was very clearly unhappy with not much of a social life or a physical life or much of anything." Tr. 886.

S.B.S.'s testimony on this point is broadly credible. It marks a believable middle path between the accounts of his parents. It recognizes that he was deeply sad and lonely in the second half of 2022. It recognizes that he stated to Bowe that he wished to kill himself at least one time (by S.B.S.'s account) and likely more times than that (as credibly recounted by Bowe).

At the same time, it recognizes that S.B.S.'s reference(s) to suicide were tools of expression—means of driving home the depth of his unhappiness—rather than evidence of suicidal ideation.

That S.B.S. was genuinely depressed is corroborated by the Skype messages—many poignant and evocative—he sent Bowe during this period. These capture his unhappiness and loneliness. *See, e.g.*, PX-4 at JB-1002 (Aug. 12) (S.B.S.: "iv'e had a shit day but im ok"); *id.* at JB-927 (Aug. 31) (S.B.S.: "anyway i got nobody to talk to and nothing to do."); *id.* at JB-893 (Sept. 11) (S.B.S.: "fucking life here sucks donkey dick with rancid cheese."); *id.* at JB-861 (Oct. 3) (S.B.S.: "sorry that i just complained and complained"); *id.* at JB-726 (Nov. 26) (Bowe consoles S.B.S. for having "a sad afternoon"); *id.* at JB-714 (Nov. 30) (S.B.S.: "Sorry, im just in a motherfucking bad mood[.] Cause the fucking dumbass devil is making my life a shit hole."). At the same time, this record reflects that S.B.S. had some good days and positive experiences. He had occasional gatherings with friends, *see, e.g.*, *id.* at JB-885 (Sept. 15) (S.B.S. tells Bowe that he's "at Lautaro's hood" so he doesn't "think we'll talk today but i'll 100% see u tomorrow"); *id.* at JB-785 (Oct. 28) (S.B.S. tells Bowe that he would be playing "roblox, and maybe hanging out w lautaro"); *id.* JB-778 (Oct. 31) (S.B.S. tells Bowe that he's "going to pedro's house for Halloween, its gonna be me, lautaro, and pedro...[a]nd hopefully luciano"), and on occasion relaxed with Swett, *see, e.g.*, *id.* at JB-944 (Aug. 26) (S.B.S. tells Bowe that he's going to "go watch a movie with mah mommah," so he won't be able to speak with him).

The Court fully credits S.B.S.'s testimony that he was "in a low mood most of the time." Tr. 942. The Court further credits that his behavior and affect should have put custodial parent Swett on red alert that her child was badly struggling and in need of help and attention, and that these signs grew during the final months of 2022. S.B.S., however, credibly testified that Swett did not alert to his anguish or meaningfully act to address it. *See, e.g.*, Tr. 951, 956 (S.B.S.)

("The constant moping, hurting myself, asking my mom to sign me up for things, or let me be with my friends, saying that I miss my dad . . . . [But s]he [still] couldn't tell I was unhappy. And even without me giving her signs, it was concerning that she by herself didn't even think maybe I should sign him up for things, maybe I should let him hang out with friends.").

Various credible sources shed light on, and corroborate, S.B.S.'s more nuanced account of his sadness during this period in Chile. One such source is the contemporaneous notes taken by a therapist, Dr. Paz Valenzuela Puchulu, whom Bowe arranged for S.B.S. to see in Chile in November 2022. Tr. 164–65 (Bowe). That visit was S.B.S.'s sole visit to a therapist before moving to the United States. The visit occurred in circumstances under which S.B.S. did not have an incentive to falsely report his state of mind. Dr. Valenzuela's notes reporting S.B.S.'s statements during this visit, reproduced in full, state:

> He spontaneously and directly declares that he wants to live with his dad.
>
> States that he feels lonely here (in Santiago), "the loneliness bothers me" as he never spends time with his mom, "because she's always tired, depressed and works a lot", "I feel I don't matter to anybody", "I know she loves me, but pills and work have taken her apart." "I see her more tired, more angry."
>
> He declares being scared of his mom, of her yelling at him, of her threatening my dad that she's going to drive him away from me. Fear that she'll blame me when I tell her something she doesn't agree with.
>
> He says he sleeps well except when he argues with his mom and then he can't sleep. He slept with his mom up to age 9.
>
> With respect to self-harm, he acknowledges having scratched himself on one occasion after an argument with his mom.
>
> With respect to nutrition, he says that he has a normal appetite but he is very thin. He believes this is because he doesn't get physical exercise, because he spends a lot of time indoors. He attends a soccer workshop but says it doesn't interest him very much. He also does Pilates and likes that because it relaxes him.
>
> He has many concerns, mentioning things that "shouldn't concern me", for example things to do with "her" (referring to his mom). "I feel I'm a burden to her." He's

also concerned about financial matters. His mom has told him they would have to
move house if they didn't have money.

He also expresses great fear that his parents "will end up in court".

He has a good time at school and sometimes with his mom.

"I don't want to leave my mom abandoned."

I can't do anything. I'm a 10-year-old kid ... with respect to the dispute between the
parents.

He states that "my dad is the opposite of my mom. He's very sociable, makes plans
with his friends, treats me well."

PX-10 at 2–3. S.B.S.'s November 2022 account aligns with themes struck in S.B.S.'s testimony

in this case nearly 16 months later—including his loneliness, unhappiness, and boredom in Chile,

his desire to leave, and his love for but ambivalence toward Swett, with whom he sometimes had

a good time, but from whom he felt emotionally distant. *Cf.* Tr. 883 (S.B.S.) ("I love her, but

she's pretty complicated.").

Further credible evidence as to S.B.S.'s state of mind during his final six months in Chile

was supplied by Dr. Ilana Attie, a New York City psychologist, who saw S.B.S. for 13 treatment

sessions between April and October 2023, each generally lasting about 50 minutes. PX-12

(contemporaneous notes of sessions). Dr. Attie's professionalism, neutrality, perceptiveness, and

precision impressed the Court. The Court is confident that, via these visits, Dr. Attie was able to

draw out S.B.S.'s true state of mind as to his time in Chile, notwithstanding his presumed interest

in painting a negative picture in the event a legal action was later initiated. To Dr. Attie, it

appeared that, in Chile, S.B.S. had been "quite depressed" and "[s]ometimes hopeless and

helpless." Tr. 761–62. He had "a sense of futility, like there was no one there that he could turn

to really to help change things." Tr. 761. That he purposefully hurt himself—by scratching his

arm—"convey[ed] a sense of desperation" about his current situation. Tr. 763–64. About his

time in Chile, S.B.S. told Dr. Attie, he felt "[b]ored, depressed, and lonely." PX-12 at 13. Also
tracking what he had told Dr. Valenzuela, S.B.S. told Dr. Attie, "Deep down, my mom isn't a
bad person," but she is like "Edward Scissorhands—hurts people and doesn't mean to." *Id.*
Summarizing S.B.S.'s account, Dr. Attie testified that S.B.S. "expressed a sort of complicated
emotion," where he "felt loved" by Swett, but felt "deprived of the sort of the everydayness of
routines in a family," like "having playdates after school or some activity set up" for a weekend.
Tr. 756.

The contemporaneous emails between S.B.S.'s parents are final confirmation of S.B.S.'s
melancholy. On September 25, Bowe, alarmed by his son's expressions, wrote Swett, urging in
strong terms that the boy receive therapy in Chile. In relevant part, Bowe wrote: "[Y]ou know
that last time, when I left, [S.B.S.] was very, very sad. Cried almost every day for weeks, was
very depressed and talked about harming himself. Said he wanted to die, wanted to commit
suicide. Very serious." RX-14 at 1. Swett replied the same day, in emphatic words that
categorically confirmed Bowe's account: "*[S.B.S.] did tell me all this about his pain and
suffering. He told me about everything you're telling me.*" *Id.* at 2 (emphasis added). At trial,
Swett testified that she had lied in making this statement to Bowe. Tr. 856–57. As to one
factual particular, Swett's denial is credible. The Court finds it possible that S.B.S., in his
discussions with Swett, had not referred to suicide specifically, and S.B.S. denied saying that to
his mother. Tr. 940. But the Court does not find at all credible Swett's claim to have lied in
reporting that S.B.S. had told her "all . . . about his pain and suffering." Swett did not have any
reason to feign awareness of her son's agony as reported to her by his father. The Court instead
reads Swett's real-time reply to mean what it says: that she, too, was well aware of his misery—
both from her son's statements to her, and from being his on-scene parent.

Nor can Bowe's account to Swett about S.B.S.'s pain and suffering be discounted as inaccurate. Although Bowe's writing and testimony at times tended towards the hyperbolic, the consistency with which he reported in real-time to friends and family the severe downturn in S.B.S.'s mental health in late 2022 is striking evidence that Bowe genuinely perceived this. *See, e.g.*, RX-3 at 1 (Sept. 13) (email from Bowe to his mom and sister: "he is in serious decline, as i've mentioned. i will probably be booking a trip between the current one, this week, and December, just because it's so bad."); RX-85 at 1 (Oct. 17) (email from Bowe to his sister: "you also have to realize or imagine he's in the middle of a depression as deep as any you've ever seen. . . . he's in solitary confinement."); RX-87 at 1 (Nov. 13) (email from Bowe to his mom: "[S.B.S.] said many many things i wish i could remember and report, but today he said, 'it's not that i can't live w/o you for 3 wks or will die from missing you. it's just that i hate being around my mom so much.'").[8]

### 2.    Bowe and Swett's Responses

Bowe and Swett responded in very different ways to S.B.S.'s anguish during the second half of 2022.

Bowe's approach had kind and cruel components. At his best, and particularly in the early parts of S.B.S.'s depressive phase, Bowe was a loving and supportive parent. He soothed S.B.S., reminded him that Bowe was there for him, and told him that his feelings of sadness would pass with time. The father-son written communications of this nature at points are even uplifting. The two often wished each other good morning, *see, e.g.*, PX-4 at JB-1022 (Aug. 7), and Bowe frequently told S.B.S. that he was "sending daddy waves," *e.g.*, *id.* at JB-1003 (Aug.

---

[8] Sonia testified that S.B.S. told her in July 2022: "Everybody thinks because I'm Mane's son that I have a wonderful life. I don't. My life in Chile is hell." Tr. 402. Although S.B.S. did not recall speaking to Sonia about how he felt about Chile before he moved to New York, Tr. 942–43, the Court credits Sonia's testimony on this point.

11), and that he loved him, *e.g.*, *id.* at JB-1194 (May 17). Bowe reminded S.B.S. to "keep breathing," *id.* at JB-1004 (Aug. 11), and to "hang on tight to me," *id.* at JB-1010 (Aug. 9). When S.B.S. told Bowe, "i got nobody to talk to and nothing to do," *id.* at JB-927 (Aug. 31), Bowe told him that "love and patience are the super powers," *id.* at JB-926 (Aug. 31), and spent the next few hours chatting with him. When S.B.S. told Bowe that he "had a shit day," *id.* at JB-1002 (Aug. 12), Bowe empathized, telling him, "my life is awfully damn boring without you, too," *id.* at JB-970 (Aug. 12) (capitalization omitted). Most of all, Bowe reminded S.B.S.: "you don't have to be stronger than you are. You're 10, so you don't have to be stronger than a 10 yr old." *Id.* at JB-965 (Aug. 16). Bowe also stepped up his pace of visits to see S.B.S. in person, and his availability as a remote correspondent. And he pressed Swett, unsuccessfully, to arrange for therapy for S.B.S. Particularly given the degree of difficulty presented to Bowe as the out-of-country parent, these aspects of Bowe's response to S.B.S.'s crisis are laudable and impressive.

But there was another side to Bowe's response—a dark and counterproductive one. Bowe's comments about Swett in his Skype dialogues with his 10-year-old son were at times mean and manipulative. He insulted Swett as a bad person and parent, and mocked her perceived faults. In this strand of messages, Bowe depicted himself and S.B.S. as allies on the side of good—aligned against the evil and/or clueless Swett. As Swett's inaction in the face of S.B.S.'s anguish persisted, Bowe's divisive messages grew and increased in venom.

Several episodes are illustrative. In late October 2022, shortly before Bowe was scheduled to arrive in Chile for a visit, Swett told S.B.S. that he would have to sleep at home for a few nights during Bowe's visit—instead of in Bowe's hotel room, per their usual practice. When S.B.S. informed Bowe of Swett's decision, the two had the following conversation over Skype:

| S.B.S.: | k, my mom told me i had to sleep here Thursday and Friday so dat sucks... |
|---|---|
| Bowe: | what the fuck ever |
| | should we tell her i'll just cancel my trip and she can figure out all the nanny shit on her own? |
| | she has no idea how to take care of you w/o a nanny |
| | not even **with** a nanny, but especially without one |
| S.B.S.: | idk, we should do whatever's best.  She said it was NECESSARY for a boy my age to sleep at his mother's house...  I told her u were only here for a couple days but she said the same thing. |
| Bowe: | she's a fucking idiot. sorry to say. this is so typical. she needs help very very badly just to deal with the situation of not having a nanny. and then when i come to help, she makes it stupid and not fun. this is why no one ever wants to help her. |
| S.B.S.: | also, wtf do i have to be there for??  Are we gonna open the fucking Chamber of Secrets from hp???? |
| Bowe: | i think the best thing we can do is shut up and accept it and do what she says, but eventually, the stupidity of what she does will make the whole thing blow up.  you'll be pissed all the time, i'll stop coming, you'll hate her all the time, and she will just keep getting crazier and crazier and fucking her life up more and more.  but you and i have to avoid being in a fight with her all the time, cuz that will wear us down. |
| | anyway.  let's focus on one thing at a time. remember that she ignores or changes half the rules she makes |
| | and in the end, she usually does what's convenient and easy for her, nothing else. |
| S.B.S.: | true. |

PX-4 at JB-776–77 (Oct. 31) (emphasis in original).

The next day, Bowe again used derogatory language.  Swett had apparently told Bowe that he could visit with S.B.S. at 11 a.m.  Bowe arrived at his hotel early—around 9 a.m.—and

wanted to see S.B.S., but S.B.S. told him that Swett was still asleep. Bowe wrote S.B.S.: "I'm truly not sure of what to do. She is the one who is wrong here and being an asshole, but i also dont want to start the visit with a fight." *Id.* at JB-771 (9:19 a.m.). S.B.S. replied: "dude i guess u should just come here... Its not very much longer until 11:00 AM and my mom is still sleeping..." *Id.* at JB-771 (9:19 a.m.). Bowe started to unpack, and wrote S.B.S.: "if she sleeps and sleeps and sleeps, i will just come. This is silly, me coming across the world and mom is too drugged out and stupid to even write me back and allow me to see you." *Id.* at JB-770 (9:28 a.m.). He added: "i'm gonna try to ignore the small annoyances and just be glad to be with you. In the big picture, we will win." *Id.* at JB-769 (9:30 a.m.).

On another occasion, Bowe reacted angrily to a dispute about medical care for S.B.S., disparaging Swett. In June 2022, just before S.B.S. was scheduled to travel with Bowe to the United States, S.B.S. had become ill with symptoms associated with COVID-19. Swett took S.B.S. to two doctors, who had cleared S.B.S. to travel with Bowe. Bowe had thanked Swett for taking care of S.B.S., and described the situation as a "horror." RX-110. Bowe expressed his own concern "about avoiding COVID" when he picked S.B.S. up, and suggested that he would "plan to stay outside your apartment just to be sure." PX-28 at 2 (June 30). But on the morning of their departure, after Swett proposed taking the still-symptomatic boy to a third doctor, Bowe erupted in a Skype message to his son:

> Bowe: She said we have to have u to the doctor at 12. Which is a total waste of time. It's just pure acting and performance. All you have to do is not drink milk or cheese and try to take a hot shower
>
> . . .
>
> S.B.S.: SHE DID NOT TELL ME ABOUT ANY MOTHER FUCKING DOCTOR
>
> SHE SPOKE NO WORDS ABOUT THAT FUCKING DOCTOR

23

|        |   |
|--------|---|
| Bowe:  | Maybe i didnt hear right but I'm 99% sure that's what she said |
|        | Dont say anything.  Its all bullshit.  She is acting like a mother instead of being a normal person with common sense |
| S.B.S.: | I THOUGHT I WAS FINALLY OUT OF THIS SHIT HOLE AND NOW SHE WANTS ME TO STAY MORE FOR A STUPID MOTHER FUCKING DOCTOR!?!?!?!?!?!? |
|        | . . . |
| Bowe:  | All of this is her pretending like she is in a movie in the role of a good mother.  It's pure fantasy |
| S.B.S.: | FUUUUUUUUUCK                    MYYYYYYYY MOOOOOOOOOOOOOOOOOOOM |
|        | 😫😫😫😫😫😫😫😫😫😫😫😫😫😫😫😫😫😫😫😫 😫 |
| Bowe:  | Anyway.  You and i just have to go along and smile and be nice until we walk out that fuckin door and never come back |
|        | All of it is a waste. |
| S.B.S.: | I BET YOU THAT DOCTOR'S APPOINTMENT IS GONNA TAKE 3 HOURS |
| Bowe:  | And it will be boring |
|        | And u and i have to pretend like we dont think she's an idiot.. |
|        | And once we're free, we're free |

PX-4 at JB-1070–73 (July 1, 9:48–9:53 a.m.).

Where Bowe responded to his son's distress in part by blaming and demeaning S.B.S.'s mother, Swett responded tepidly.  Presumably because Swett and S.B.S. lived together, Swett's responses are not chronicled in writing in the manner that Bowe's were.  But they emerge clearly from the assembled evidence.  Most dramatically, even after Swett had acknowledged S.B.S.'s "pain and suffering" and agreed with Bowe's assessment that S.B.S. "was very, very sad," RX-

14 at 2, and even after S.B.S. had reported scratching himself in a school bathroom and drawing blood, Tr. 603 (Swett), Swett did not act. Resisting Bowe's entreaties, she did not send her 10-year-old child to a therapist. Tr. 859–60 (Swett). She testified that she was "overwhelmed with a lot of work," Tr. 860, and chose to blame S.B.S.'s sadness solely on what she perceived as S.B.S.'s unhealthy codependent relationship with Bowe, Tr. 552–53. At trial, both S.B.S.'s treating psychologist, Dr. Attie, and Swett's own expert psychologist, criticized Swett's resistance to arranging for professional treatment for S.B.S. as negligent, Tr. 1014 (Attie), or neglectful, Tr. 1303 (Favaro). Swett did not take other action to remove S.B.S. from his rut, leaving him in a routine he found lonely. Unsurprisingly, as Dr. Attie testified, S.B.S., at a hard moment in his life, "felt neglected" by his custodial parent. Tr. 756.

In sum, where Bowe developed a problematic buddy-relationship with S.B.S.—speaking for hours on end, embracing profanity, and peppering Skype exchanges with demeaning remarks about Swett—Swett gave too little time and attention to S.B.S. and cold-shouldered his emotional needs and calls for help.

In early December 2022, the brewing tension between the parents, each of whom had come to view the other as at fault, came to a head. On December 1, Swett told S.B.S. that he had to go to school the next day, even though S.B.S. felt "kinda sick," PX-4 at JB-710, because he only had "two more days of school left" for the year, Tr. 562 (Swett). That led the enraged S.B.S. to send Bowe the following disturbing Skype messages:

> S.B.S.:        im so mad u can't even fucking imagine
>
>                i still feel kinda sick and my fucking mom is making me go to school tomorrow
>
>                i swear im gonna fucking kill her and hang her until she can't breath.

well, i imagine the hanging part comes before i kill her but still, im pissed at her

i'm even crying right now

like you think the fucking weight that ur carrying is finally off you but my mom's like: Oh, im gonna FUCK UP YOUR ENTIRE FUCKING WEEK CAUSE I FUCKING HATE YOU | thats what it ducking feels like

PX-4 at JB-710 (5:58–6:01 p.m.). Half an hour later, Bowe replied: "fuck. just got this dude. i'm sorry." *Id.* at JB-710 (6:29 p.m.). He added: "i love you. and this will pass. that's all i can say." *Id.* at JB-710 (6:29 p.m.).

At some point that day, Swett read S.B.S.'s Skype messages and started to message Bowe from S.B.S.'s account. Swett wrote in Spanish: "It's me. Mane. I'm here with [S.B.S.] next to me." RX-24 at JB-708_T (8:48 p.m.). After some confusion, Bowe grasped that his interlocutor was Swett, and responded: "my goal was very simple: i want to let my son speak freely and express his anger. if you pay attention, you will notice i did not say anything bad about you. i did not know your side of the story, so why would i?" *Id.* at JB_706_T (9:02 p.m.).

Swett then read earlier Skype conversations between Bowe and S.B.S., including ones in which Bowe had demeaned her. She termed the December 1 exchange in which S.B.S. swore to Bowe that he would "fucking kill and hang her until she can't breath[e]" the "chat of violence" (in Spanish, the "chat de violencia"), and termed other exchanges "parental manipulation" chats. Later on December 1, Swett and Bowe exchanged the following messages in Spanish:

Swett:      And there are months of abuse against me.

            And worse. How you're damaging our son's mind.

            If for you I am a Fucking idiot

            But to him I'm his mother who loves him

Don't keep poisoning our son.

He is a child

And everything here is abusive dialogue for my son and against me.

In English, in Spanish, or Japanese.

It's abuse

Bowe:      Mane, I call myself, me, an idiot 5 times a day. because it's true. I also tell [S.B.S.] many, many times, very, very often, that you are smart and hardworking and that you love him. because that is also true. I also told him today or yesterday that it's important for him to go to school. That's all.

*Id.* at JB-705_T (9:27–9:32 p.m.).

Bowe then apologized to Swett. In a December 2 email, he wrote that he was "so sorry I said something bad about you," and "sincerely regretted [his] part in this," but added, "I also have to tell you that for many years, I've heard many negative things you've said about me," including that he was "poor," a "bad father," and that he had "tried to steal" S.B.S., and noted that he often told S.B.S. "all the good things" about her, including that she was "smart" and "hardworking." RX-25 at 1. On December 2, Bowe wrote S.B.S. that he had been "wrong" to have "used the word 'idiot'" in referring to Swett, but then added, "I DO use that word a lot, not just about her," and noted that Swett "does not know that I also very frequently say good things about her." PX-4 at JB-705. At the same time, Bowe told S.B.S. that if Swett "continues to interfere with our communication, however, or our right to visitation, then we will have a much bigger, more expensive problem." *Id.*

**C.    S.B.S.'s December 2022 Trip to New York**

**1.    September to December 2022: Initial Plans**

Partially overlapping with the events chronicled above, in fall 2022, Swett and Bowe also attempted to plan S.B.S.'s annual trip to New York for his summer vacation (December to late February). In September, Bowe broached the subject via email, suggesting a schedule tracking the contours of previous trips—in which S.B.S. would stay in New York from December until the end of February, with Swett visiting them briefly for Christmas. RX-12 at 2 (Sept. 11 email). Swett was hesitant, not wanting to be separated from S.B.S. for three months. *Id.* at 2 (Sept. 12 email). To address that concern, Bowe suggested that Swett "visit a few weeks later" or "meet [them] in Mexico" to make the three months apart more bearable. *Id.* at 1–2. Swett responded that "[i]t would be great if you all could invite me to Mexico for a couple of days"; on that basis, she signed off on a December trip to New York to join S.B.S. and Bowe for Christmas. *Id.* at 1. Bowe then booked Swett a hotel room in New York and round-trip airline tickets between Chile and New York. RX-13 (Bowe's September 14 email confirming "hotel paid"); RX-33 (American Airlines trip confirmation). He forwarded the confirmation emails to Swett, who responded positively. RX-13 at 1.

In November, as S.B.S.'s mood deteriorated, and Swett and Bowe's dealings grew more contentious, Swett denied having agreed to allow S.B.S. to stay in New York for three months. RX-20 at 1. Bowe disputed her recollection, asking: "Do you remember when we agreed on the plan?" *Id.* He noted that he and S.B.S. are "scheduled to fly on December 8" to New York and that she was "scheduled to fly on December 23" to join them for Christmas. *Id.* In early December, these planning discussions ground to a halt, after Swett discovered the chat of violence and that S.B.S.'s passport had expired. Swett insisted that Bowe not come to Chile until they resolved both issues. Tr. 101 (Bowe).

On December 8, the date he had originally planned to arrive, Bowe flew to Chile, notwithstanding Swett's wishes. Bowe's hope was to travel with S.B.S. back to New York for the holiday visit. Tr. 101 (Bowe). That trip was postponed from December 12 to December 23, while Swett and Bowe renewed S.B.S.'s passport and attempted to work through the issues spurred by Swett's discovery of the chat of violence. Tr. 101 (Bowe); RX-29 at 4–5. This period, Bowe testified, was "very chaotic"—"[e]verything was very provisional" and planned "last-minute." Tr. 101–02.

On December 23, after much back and forth, Swett signed a written travel authorization. It permitted Bowe to travel to the United States with S.B.S. until January 8, 2023, when S.B.S. was due in Chile. PX-43 at 3. Bowe testified that he was "surprise[d]" that the authorization expired on January 8, 2023, because he and Swett "had never discussed that date." Tr. 102–03. He testified that he had "expected that the date would be sometime later in February," "similar to the several visits [they] had taken in previous years." Tr. 103.

That day, S.B.S. and Bowe flew to New York. As of when Bowe left Chile with S.B.S., he testified, he did not yet "have a plan . . . not to bring S.B.S. back to Chile." Tr. 103–04. At the time, he was considering "about 50 options," but had not yet decided whether, or if so, when, he would be returning S.B.S. to Chile. Tr. 104. S.B.S., for his part, felt great relief after leaving Chile—believing he had finally "escaped." Tr. 954–55 (S.B.S.). Once in New York, he told his father that "[h]e didn't want to go back" to Chile. Tr. 118 (Bowe). Bowe, with S.B.S.'s wishes in mind, "was very desperate to not return him." Tr. 118 (Bowe).

### 2.    January 2023: Bowe Does Not Return S.B.S. As Required

On January 5, Bowe and Swett had a remote meeting, facilitated by their translator, Felipe Roa. The meeting notes reflect that Swett insisted that Bowe and S.B.S., consistent with

the written travel authorization, return to Chile on January 8 "to sign a travel permit and [a] commitment [from Bowe] to do the mediation in March." PX-49 at 1. Once that happened, Swett told Bowe, she would permit Bowe and S.B.S. to fly back to New York to continue their vacation until a date decided by her. *Id.* The meeting notes state that "[Swett's] decision [was] final." *Id.*; *see* Tr. 630 (Swett) ("It was my only decision."). Swett thus rejected Bowe's arguments against requiring him to return with S.B.S. on January 8, which included the "high emotional cost of interrupting [S.B.S.'s] vacation" and the "high cost of lawyers, plane tickets, and hotels." PX-49 at 1. Bowe had pressed, unsuccessfully, for a "[l]onger vacation until mid-February." *Id.*

That same day, Swett sent Bowe an agitated email. Urging him to agree to her plan, she asked him "to please think it over very carefully" before he "repl[ied] with [a] final decision." PX-68 at 2. She stated that upon arriving to Chile on December 8, he had "been doing things wrong" and "committing error after error." *Id.* She reiterated:

> You left Chile KNOWING you had a "Christmas trip" authorization with a return date of January 8. Is that correct? So . . . I'm offering to give you a new authorization for a "Vacation trip" and you're rejecting it?
>
> Come on! Let's end this nightmare. Let's do what we have to do now and with the idea that [] we'll resolve things via mediation later in March.
>
> And that will put an end to the problem.

*Id.*

On January 6, Bowe responded to Swett, stating that it was not "necessary for [him] to travel to Chile together with [S.B.S.] for [her] to authorize the extension of the vacation." PX-77 at 4. He added:

> I beg you to let [S.B.S.] start his holidays right now. We can resolve everything you need without him traveling to Chile. . . . Returning to Chile makes no sense.

> In addition, don't forget that you finally gave permission to travel on the last day
> of our trip, just a couple of hours before. Only then did I learn that you had given
> it until January 8. You're aware that we had previously discussed up to the end of
> February.
>
> I understand that you would like this to be less time, but please don't make us return
> purely to agree on that date.

*Id.* at 5–6. Swett responded:

> The meeting we had yesterday killed my last hope of talking with you as two
> parents who love their son. You hurt me and you continue hurting me. I don't see
> any goodwill in you. For that reason, everything that happens from now on I will
> have to do protected by my attorney. . . .
>
> There are no interpretations to be made of the authorization of which you speak.
> The subject line of the emails clearly states [] "Christmas trip" and the departure
> and arrival dates are also very clear. I authorize you to take [S.B.S.] to spend the
> holidays in NY on the understanding that I will have daily contact with my son and
> that you will bring him back to his home on January 8.
>
> A commitment you don't want to comply with. . . .
>
> If you now don't want to stay in Chile for a few days to comply with what we both
> agreed in our meeting with the attorneys . . . then I can't force you.

*Id.* at 2–3.

Bowe did not return S.B.S. to Chile on January 8, 2023. Citing the understanding that he

and Swett had reached in September, before Swett had granted a limited travel authorization that

expired January 8, Bowe that day emailed Swett: "Our agreement, written and agreed to over

email in September, was that [S.B.S.] would take vacation and would see his grandmother, and

that I would take him back to Chile in February [2023]. That is my plan." PX-5 at 3. Bowe

argued that S.B.S.'s best interests were disserved by requiring him to fly to Chile to obtain an

extension of the travel authorization. He wrote: "We have shared custody. I'm exercising my

legal right. If you want to take legal action in Chile, it will only serve to violate U.S. law." *Id.*

31

He instead "suggest[ed] that [Swett] give [] permission to extend the vacation until February"

2023. *Id.*

Bowe testified that, in sending this email, he was "ask[ing] for permission to extend[] the

vacation" to late February. Tr. 109. Swett testified that she "did not give him permission to

extend the stay in the United States." Tr. 636. Both testified to appreciating that, by not

returning S.B.S. to Chile on January 8, Bowe was clearly breaching the agreement and possibly

breaking the law. Tr. 110 (Bowe) (by not returning S.B.S. to Chile on January 8, Bowe knew he

"was violating something, violating the agreement, violating Chilean law, I didn't know"); Tr.

567 (Swett) (Bowe had "just committed something illegal").

After sending this email, Bowe and Swett had a video call that lasted about an hour, in

which Swett "begg[ed] him to bring S.B.S. back." Tr. 636 (Swett). Bowe reiterated that he and

S.B.S. "would not be returning to Chile that day." Tr. 108 (Bowe). Bowe did not commit to

returning S.B.S. "on a certain date"; he ended the call by telling Swett that he "need[ed] to

think." Tr. 111 (Bowe).

### 3.    January to February 2023:  Bowe and Swett Spar, and Bowe Decides To Retain S.B.S.

After January 8, 2023, Bowe actively considered and discussed with others—including

his mother, sister, friends, and counsel—whether to permanently retain S.B.S. in New York.

*See, e.g.*, Tr. 426–29 (Clegg). He did not finally decide to do so until shortly before February 23,

when, through the mediator, he conveyed that decision to Swett. RX-5 at 2.

Between early January and late February 2023, Bowe took steps to acclimate S.B.S. to

potential permanent residence in New York. On January 3, Bowe asked Thomas Lee, the parent

coordinator at P.S. 41—the local public school—about the logistics of enrollment. Tr. 118

(Bowe); RX-81 at 2 (Bowe email to Lee). But, because Bowe did not have legal custody of

S.B.S., he could not officially enroll him in school. On January 10, Bowe had S.B.S. evaluated by a tutoring company, which determined that S.B.S. was "a year and a half behind in math." Tr. 118 (Bowe); *see* RX-6 at 9. On February 4, Bowe took S.B.S. to a doctor, whose physical exam revealed that S.B.S. was in "the fifth percentile of growth." Tr. 116 (Bowe); *see* RX-6 at 9.

During this period, Swett grew increasingly distrustful of Bowe. She believed Bowe would keep S.B.S. in the United States until the end of February "no matter what." Tr. 864 (Swett). She believed there was no "possibility of getting [Bowe] to bring S.B.S. back before the end of February." Tr. 864 (Swett). And although Swett's communications with Bowe were restrained in tone, she took private steps that reflected her alarm at Bowe's breach. On January 9, Swett emailed Bowe: "I'm ready to hear when you have clarity. As you're making new plans, I just want you not to forget to bear in mind that I won't be in Chile in February until the 18th." PX-75 at 2.[9] That email reflected the fact that Swett had planned a trip to Mexico for a week in February for a friend's wedding, in the expectation that Bowe, after returning to Chile on January 8, would thereafter return to New York with S.B.S. Tr. 638 (Swett) ("I had told [Bowe] ahead of time that I had a wedding for one week in Mexico."). But on January 10, without alerting Bowe, she filed a police report in Chile. She reported that "S.B.S. had not [been] returned to Chile" as required by the travel authorization. Tr. 638 (Swett); *see* PX-47 (police report). Swett did not complete the police reporting process, however, because she wanted to protect S.B.S. and not alert him that he had been kidnapped. Tr. 732–33 (Swett); Tr. 865 (Swett). Hoping Bowe would return S.B.S. in late February, she also did not commence formal legal proceedings against Bowe. Tr. 723 (Swett).

---

[9] Bowe's response, if any, is not reflected in the record.

On January 14, Bowe sent Swett a message to notify her that he and S.B.S. were scheduled to travel to Panama City between January 15 and 23. RX-43 at 1. The next day, he sent a follow-up audio message. RX-38 at 1. Swett responded:

> I see that there's an audio message from you here. . . . If something urgent is happening with [S.B.S.], please write [to] me. I don't want to listen to this audio message right now because I'm scared. I will do it later. Last Sunday [January 8] at almost the same time, I received a message from you here that told me about an email that said that my son wasn't coming back. The pain left me on the floor on my knees. I still haven't been able to recover from that. Now it's Sunday again. Same day. Same time. Right now I cannot receive another piece of news. I'll listen to it when I'm ready.

*Id.* at 1–2.

As February approached, Swett grew more anxious. She repeatedly sought reassurance that Bowe would return S.B.S. in February. On January 21, she emailed Bowe: "I'm writing you well in advance because I know neither one of us wants to have another misunderstanding." PX-7 at 3. She stated that because S.B.S.'s school year in Chile started on March 1, she "need[ed] him to arrive in Chile, please on Sunday a.m., February 26th." *Id.* She asked Bowe to "[p]lease confirm for [her] whether [he] understood everything [she was] telling [him]." *Id.* The next day, Bowe emailed a noncommittal response, stating: "Yes, I understand this." *Id.* This, Bowe testified, was intended to convey that "[he] understood her Spanish and [he] understood that's what she wanted." Tr. 115. He testified that he was not agreeing to return S.B.S. to Chile on February 26, Tr. 115, and his message was "intentionally vague," Tr. 211.

On February 20, Bowe emailed Swett to arrange a meeting with a mediator. Swett agreed to a mediation on February 23. RX-45 at 4. In that email chain, she asked Bowe twice: "I can be certain that [S.B.S.] will come back home with me this Sunday, right?" *Id.* at 2; *see id.* at 1 ("Can I be certain that [S.B.S.] is coming home with me this Sunday?"). Bowe did not

directly respond. *Id.* On February 21, she messaged Bowe on WhatsApp: "I can rest easy that my son will come home on Sunday, right?" PX-33 at 2. Bowe did not respond.

On the morning of February 23, between 9:14 a.m. and 10:15 a.m. EST, Bowe and Swett held a remote mediation. Tr. 664–65 (Swett); RX-5. The mediator, speaking for Bowe, informed Swett that S.B.S. would not be returning to Chile. Tr. 664 (Swett). Bowe added that he had concerns about S.B.S.'s "school, his physical [] development, [and] his lack of activity." Tr. 122 (Bowe). Swett protested his decision with what Bowe considered "a memorized answer." Tr. 122 (Bowe). Afterwards, she sent Bowe an angry email, accusing him of kidnapping S.B.S. *See* PX-74 at 2. She wrote: "You took [S.B.S] on December 23, 2022, knowing that you were required to deliver him to me on January 8, 2023, and you DIDN'T do it." *Id.* She added: "In the interest of our son's well-being, I didn't want to press the red button and go and search for him there with the PDI [Chilean Investigative Police Force] and bring him back to Chile. I wanted to care for him and keep him from that trauma, and that's the only reason I've waited in silence and given you a second chance to hand him over to me this coming Sunday, February 26, 2023. Today, 3 days before that date falls, you tell me that you will NOT bring him back home to me." *Id.* She wrote: "This is the last chance I'll have to talk to you as a mother to a father without attorneys or judges, without police officers or the PDI, without the press or the media." *Id.*

On February 26, Bowe did not return S.B.S. to Chile. He instead told Swett that he believed "it was best for [S.B.S.] to stay in New York." RX-6 at 6. Later that day, he sent Swett a long email, in which he stated that his lawyers believed that S.B.S.'s custody was improperly registered in Chile and thus violates U.S. law; that her accusation of kidnapping S.B.S. was more legally complicated than she thought; and that theirs was a civil not a criminal proceeding. PX-

110 at 2. Bowe also told Swett that he would be asking a court to allow S.B.S. to stay in New York because of the "serious problems" in Chile, including S.B.S.'s "conversation about suicide," "the chat about violence," his lagging physical and educational development, "his social isolation in a house with 32 nannies since he was born," and his lack of consistent access to food in the kitchen. *Id.*[10] Bowe also rejected that S.B.S. living in New York was "a fantasy." *Id.* He wrote that S.B.S. "does not want to be forever on vacation. He wants to go to school here and work hard and improve his mind and his physical condition." *Id.*

That evening, S.B.S. and Swett had a video call, with Bowe participating at the start. S.B.S. repeatedly and with evident conviction told Swett that he did not want to return to Chile, which he termed a "prison." RX-51 at 9. During the call, which Bowe recorded, S.B.S. told Swett that in Chile "every day, I wanted to kill—I wanted to die. Every day, I was crying. . . . And here, all I've done is play with kids and be outside." *Id.* at 4. He added: "Listen to me. In Chile, I want to kill myself. The kids laugh at me. I'm home all day doing nothing, and I'm sad the whole damn day. My mom is never there, and my dad isn't there. I can't live like that." *Id.* at 9. S.B.S. asked Swett: "[D]o you remember when I scratched my arm in the school bathroom?" *Id.* at 3. Swett responded: "Yes, I remember, my love. I remember." *Id.* Later in the call, S.B.S. grew frustrated that Swett, in his view, was not listening to him, and expressed the fear that if he returned to Chile he was "never going to [be able to] leave." *Id.* at 9. He also stated that he preferred that Swett move to New York: "Just imagine, you live . . . 2 blocks away. We see each other daily. I see my dad and my mom. I play with kids. I'll have a good education." *Id.* at 14.

---

[10] The next day, Bowe reported to Swett that he had filed a petition for the custody agreement to be transferred from Minnesota to New York. This filing, he stated, was "a formality that simply changes the jurisdiction" and "has nothing to do with changing anything else." PX-111 at 2.

Throughout the call, Swett attempted to reassure S.B.S., without apparent success. She told S.B.S. that he would be permitted to leave Chile upon returning. She stated that she would have preferred to discuss these issues with Bowe in person. Finally, she stated, she doubted that she could relocate to New York because of her acting work and because Bowe "is going to file a complaint against [her] in court." *Id.* at 13. Bowe interjected to state that he would not prevent Swett from moving to New York, living close by, or seeing S.B.S. on a regular basis.[11] *Id.* at 14.

### D.    S.B.S.'s Integration to Life in New York

After deciding to keep S.B.S. in the United States, Bowe took steps to integrate S.B.S. to New York. He signed S.B.S. up for after-school programs, enrolled him in summer camps, facilitated playdates with children his age, and gathered with relatives and family friends. During this time, S.B.S. talked to Swett daily, primarily through Skype video calls. The tenor of these communications matched that of the February 26 call. S.B.S. firmly and repeatedly voiced his objections to returning to Chile. On a recorded March 11 call, for example, he repeatedly stated: "I can't go back to Chile." RX-53 at 6. He urged Swett to "[a]rrang[e] things with [Bowe]" and "resolve [the matter]" so he could live in New York permanently. *Id.* at 9–10. He stated: "You don't understand. I don't want to be on vacation. I actually want to go to school here." *Id.* at 9.

On March 17, Bowe commenced an action in New York family court in Manhattan. His emergency petition sought to modify the Minnesota custody order, with the goal to gain full legal custody of S.B.S. RX-6. It stated that modification was necessary because having the child

---

[11] Bowe stated the same in a February 27 email to Swett. He wrote that Swett was "perfectly free to come" to the United States to visit S.B.S.; that they could "speak directly to each other"; that "the lawsuits and lawyers can be put on pause or stopped at any time"; and that as parents, they could "reach any agreement they wish" with regards to S.B.S.'s custody. PX-111 at 2.

"return to Chile would subject the child to imminent and grave risk of harm based on the child's representations that he will harm or kill himself in Chile." *Id.* at 2. The petition sought, for Bowe, temporary custody of S.B.S. and the right "to make education and medical decisions for [S.B.S.] including the right to enroll [him] in school in New York City and therapy." *Id.* at 10–11. Swett had notice of the petition but did not appear.[12] On April 11, the family court held a virtual hearing, RX-9 at 1; and, after Swett did not appear, ordered a temporary modification under which Bowe received sole physical and legal custody of S.B.S, RX-68 at 1–2.[13] On June 9, 2023, the family court held another hearing. RX-71 at 1. After Swett again did not appear, the court issued a final custody order by default.[14] RX-72 at 1–2.

After obtaining custody in April, Bowe enrolled S.B.S. in fourth grade at P.S. 41, and in therapy sessions with Dr. Attie. Tr. 132–33 (Bowe). During these sessions, Dr. Attie explored subjects including how S.B.S. was adjusting to life in New York; his experiences in Chile; and his relationships with his parents, family members, and friends. PX-12. Dr. Attie's assessment was that S.B.S. was "very polite," "cooperative," "well-related," "thoughtful," and "unusually well behaved." Tr. 753. Dr. Attie noted that S.B.S.'s relationship with his father "felt warm and affectionate." Tr. 771. Although Dr. Attie had never spoken to Swett, Dr. Attie perceived that the relationship between S.B.S. and Swett was more strained and complicated. In one session,

---

[12] On March 20, Bowe's attorney emailed Swett, in English, with notice of the family court action. RX-70 at 1 (Bowe's attorney's email to Swett of March 20).

[13] On April 10, Bowe's lawyers had emailed Swett, in English, with notice of the April 11 virtual hearing. RX-9 at 1 (Bowe's attorney's email to Swett of April 10). On April 11, Swett was personally served with the petition. It is unclear whether physical service was achieved before the noon hearing. Tr. 129–30 (Bowe); RX-10 at 2.

[14] The day before, Bowe's counsel had emailed Swett, in English, providing notice of the hearing and the ability to participate remotely. RX-71 at 1 (Bowe's attorney's email to Swett of June 8).

S.B.S. reported that he felt as if "[he was] not her child," but "adopted" by her. Tr. 767. At the time, Dr. Attie noted, S.B.S. was "struggling with a lot of feelings" regarding his relationship with his mother and his time with her in Chile. Tr. 767. S.B.S. often described "a sense of aloneness and sadness and kind of unhappiness in Chile." Tr. 768. S.B.S. conveyed a concerning "sense of desperation[,] hopelessness, helplessness, worthlessness" while living in Chile. Tr. 768. At the same time, Dr. Attie noted that S.B.S. was adjusting well to life in New York. To her, S.B.S. seemed "very anxious that something could happen" and "that he would have to go back." Tr. 769. She perceived that he "didn't want to lose the life that he was building" in New York. Tr. 770.

S.B.S. saw Dr. Attie 13 times between April 20 and October 16, 2023. PX-12. Initially, Dr. Attie and S.B.S. met weekly. In June, Bowe changed the schedule, shifting to monthly sessions. Tr. 257–58 (Bowe). Bowe attributed the change to S.B.S.'s summer schedule—he was enrolled in three summer day-camps and frequently traveled with Bowe—and the expense and inconvenience of the sessions. Dr. Attie urged Bowe to continue with therapy, stating that S.B.S. had unresolved issues suited for therapy, including those arising from his separation from Swett. Dr. Attie reduced her rate and recommended child psychologists nearer Bowe's home. *See* Tr. 822, 832. Despite the reduced rate, Bowe opted not to continue S.B.S.'s treatment with Dr. Attie or to arrange for S.B.S. to see a nearer psychologist. S.B.S.'s therapy thus ended in October 2023.[15]

---

[15] On December 19, 2023, Bowe had a final meeting with Dr. Attie. She again urged continued therapy for S.B.S.; Bowe discussed the litigation avenues available to Swett, reporting his (mistaken) conclusion that because a year had passed since S.B.S. arrived in the United States, Swett's one remaining legal avenue had closed. PX-12 at 15. The Court concludes that although Bowe's main motive for enrolling S.B.S. in therapy was to benefit S.B.S., a material driver was also Bowe's strategic perception that doing so could assist him in defending against a potential Hague Convention or custody action. Bowe's disregard of Dr. Attie's firm and wise counsel to

In September 2023, S.B.S. enrolled in fifth grade at P.S. 41. S.B.S. has quickly adjusted to school—steadily improving in most academic subjects and projecting enthusiasm about his studies. He has been admitted for sixth grade to the Lab School, also a public school. Tr. 313–15 (Trauman); Tr. 136 (Bowe).

In late March 2024, as depositions and trial in this case neared, Swett visited New York and saw S.B.S. in person for the first time since December 2022. Their first meeting was turbulent, as S.B.S. initially did not want to see her, and "had been crying in the bathroom for a long time" before they met. Tr. 579 (Swett). After several hours, however, the two eased into "talk[ing] about normal things," Tr. 583 (Swett), and later gathered multiple times before and during trial, *see* Tr. 584–85 (Swett) (describing picking up S.B.S. twice from karate; joining S.B.S. for a friend's birthday party; and having a sleepover at Swett's hotel).

The Court reviews S.B.S.'s acclimation since his removal from Chile in detail below, in addressing the first two affirmative defenses. A short summary is that, based on all percipient accounts, S.B.S.'s life in New York City since early 2023 has been content and happy, with the exception of two major stressors—his physical separation from his mother, and this litigation.

## V.    Discussion

Bowe admits that he wrongfully retained S.B.S. in the United States. He pursues three affirmative defenses to Swett's Petition for return: that S.B.S. (1) objects to being returned, and is of sufficient age and maturity for his views to be taken into account; (2) is well-settled in the United States; and (3) would be at grave risk of harm if returned to the country of habitual residence, Chile.

---

continue therapy is disappointing. It is inconsistent with the generally positive portrait Bowe left of his discharge of his parental responsibilities since bringing S.B.S. to New York.

It is common for respondents in Hague Convention cases to pursue these defenses. This case differs from the norm in an important respect, relating to the third defense: that return would present a grave risk to the child's physical or psychological well-being. Respondents who pursue that defense often claim, and sometimes establish, that, if returned, the child would face abuse at the hands of, and/or countenanced by, the petitioning custodial parent.[16] No such claim has been or could be made here. Bowe has not claimed that Swett ever engaged in such malignant conduct during her decade as S.B.S.'s custodial parent in Chile. The evidence is emphatic that she did not. The evidence instead is overwhelming that Swett was well-intentioned and loving. To the extent lapses by Swett gave rise to S.B.S.'s despondency during his final six months in Chile, these were ones of omission (absence, detachment, and inattention), not commission. And although Bowe fairly casts himself as rescuing S.B.S. from a sad existence to which Swett had turned a blind eye, the evidence falls far short of showing that S.B.S.'s

---

[16] *See, e.g., Davies v. Davies*, 717 F. App'x 43, 49 (2d Cir. 2017) (grave risk finding upheld based on petitioner's "extreme violence and uncontrollable anger [and] psychological abuse of [respondent] *over many years*, much of which was witnessed by [the child]"); *Porretti v. Baez*, No. 19 Civ. 1955 (RJD), 2019 WL 5587151, at *9 (E.D.N.Y. Oct. 30, 2019) (grave risk established where petitioning parent abused children by holding them "hostage" for 26 days, during which they did not attend school, were not produced pursuant to court order, and were prevented from seeing their mother); *Mohácsi v. Rippa*, 346 F. Supp. 3d 295, 322 (E.D.N.Y. 2018), *aff'd sub nom. In re NIR*, 797 F. App'x 23 (2d Cir. 2019) (grave risk established based on "likelihood of continued abuse and harmful psychological effects" child "is likely to experience were he to witness the abuse" by petitioner towards respondent if repatriated); *Rubio v. Castro*, No. 19 Civ. 2524 (KAM) (ST), 2019 WL 5189011, at *24–27 (E.D.N.Y. Oct. 15, 2019), *aff'd*, 813 F. App'x 619 (2d Cir. 2020) (finding grave risk established, but granting petition because ameliorative measures sufficient to ameliorate harm); *Velozny ex rel. R.V. v. Velozny*, 550 F. Supp. 3d 4, 21–22 (S.D.N.Y. 2021), *aff'd*, No. 21-1993, 2021 WL 5567265 (2d Cir. Nov. 29, 2021) (grave risk alleged but not found where evidence failed to establish by clear and convincing evidence that return would expose children to physical or psychological harm); *In re Lozano*, 809 F. Supp. 2d 197, 224–25 (S.D.N.Y. 2011), *aff'd sub nom. Lozano v. Alvarez*, 697 F.3d 41 (2d Cir. 2012), *aff'd*, 572 U.S. 1 (2014) (same, based on abuse allegations); *Gross v. Gross*, No. 23 Civ. 1632 (AMD), 2024 WL 1367957, at *8–9 (E.D.N.Y. Mar. 31, 2024) (same).

circumstances in Chile were so intolerable, or durable, to make out the grave risk defense, let alone by clear and convincing evidence.

The Court nonetheless denies the Petition for return, finding compellingly established the other two defenses. Each defense ultimately respects S.B.S.'s latitude to author his destiny.

First, this is a case in which the removed child forcefully objects to being returned and is of sufficient age and maturity for his views to be taken into account and given weight. As detailed below, for nearly the past two years, starting a half-year before his departure from Chile and extending to his *in camera* interview by the Court three weeks ago, S.B.S. told every adult who would listen—and some who would not—of his earnest and factually based desire to live in the United States, not in Chile. In a case with voluminous evidence and ample complexities and ambiguities, the consistency and strength of S.B.S.'s views on this point—expressed with the precocity and articulateness of which the admiring adults in S.B.S.'s life have often taken note—is a vivid through-line. It justly decides this case.

Second, this is a case in which, with the Petition for return having been filed more than a year after the wrongful removal, the child has become settled in his new environment. As also detailed below, over the past 16 months, S.B.S., through his and Bowe's efforts and those of a large and widening support circle, has built a stable, happy, purposeful, and together life in New York City, anchored in family, friends, community, activities, and education. His trajectory is upward. And the record inspires confidence that it will remain so. By the governing standards, S.B.S. is well-settled in his new environment.

The Court below first explains why Swett has made out a *prima facie* case of wrongful removal. It then evaluates Bowe's defenses. It then considers whether, notwithstanding that two

defenses have been established, equitable considerations arising from Bowe's problematic conduct require S.B.S.'s return. Finding not, the Court denies the petition.

### A. *Prima Facie* **Case**

To establish a *prima facie* case of wrongful retention under the Hague Convention and ICARA, a petitioner must show by a preponderance of the evidence that: "(1) the habitual residence of the child immediately before the date of the alleged wrongful retention was in a foreign country; (2) the retention is in breach of custody rights under the foreign country's law; and (3) the petitioner was exercising custody rights at the time of the alleged wrongful retention." *In re Lozano*, 809 F. Supp. 2d at 218 (citing 42 U.S.C. § 11603(e)(1)(A)).

Bowe does not dispute that Swett has established a *prima facie* case. She clearly has.

As to the first element, S.B.S.'s habitual residence at all times, including immediately before he was wrongfully retained in early 2023, was in Chile, under the joint custody agreement entered in Minnesota family court in March 2013 and later registered in Chile. It gave Swett sole physical custody of S.B.S. and permitted her to "establish a residence for herself and S.B.S. in Chile." Minn. Custody Order at 4. As to the second element, Bowe's retention of S.B.S. in New York was a blatant breach of Swett's custody rights. The custody order, although granting Bowe "unrestricted parenting time with S.B.S. [for] a minimum of 90 days/nights per year," required him to "obtain[] authorization from [Swett] before [Bowe] travels abroad (outside of the country of Chile) with S.B.S." *Id.* at 6–7. Swett had signed a written travel authorization that permitted Bowe to travel to the United States with S.B.S. only through January 8, 2023. PX-43 at 3. By keeping S.B.S. past that date, and by (beginning February 23) declaring his intent to keep S.B.S., Bowe breached the custody order. As to the third element, it is undisputed that Swett was exercising her custody rights.

**B.      Age and Maturity Affirmative Defense**

    **1.      Applicable Legal Standards**

Article 13 of the Hague Convention permits a court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his or her] views." Under Article 13, a "child's views concerning the essential question of [his or her] return or retention may be conclusive" provided the child has "attained an age and degree of maturity sufficient for its views to be taken into account." Elisa Pérez-Vera, *Hague Convention on the Civil Aspects of International Child Abduction: Explanatory Report* ¶ 30 ("Pérez-Vera Report"); *see Gitter*, 396 F.3d at 129 n.4 (recognizing Pérez-Vera Report as "an authoritative source for interpreting the Convention's provisions"). "[I]t would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against [his or her] will." Pérez-Vera Report ¶ 30. However, "the exception must be construed narrowly so its application does not undermine the express purposes of the Convention." *Velozny*, 550 F. Supp. 3d at 22 (cleaned up) (citing *Yang v. Tsui*, 499 F.3d 259, 278 (3d Cir. 2007)). And "proving that the defense applies is not dispositive; courts ultimately retain discretion to order repatriation despite that showing." *Id.*; *see Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 204 (E.D.N.Y.), *aff'd*, 401 F. App'x 567 (2d Cir. 2010) ("[A] district court can decline to order return of a wrongfully retained or removed child on [this] ground alone.").

    "No particular age automatically confers maturity on a child." *Broca v. Giron*, No. 11 Civ. 5818 (SJ) (JMA), 2013 WL 867276, at *9 (E.D.N.Y. Mar. 7, 2013), *aff'd*, 530 F. App'x 46 (2d Cir. 2013). "Whether a child is mature enough to have [his or her] views considered is a factual finding that a district court must make in light of the specific circumstances of each case." *Haimdas*, 720 F. Supp. 2d at 205 (internal quotation marks omitted). "Given the fact-

intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity

exception are understandably disparate." *de Silva v. Pitts*, 481 F.3d 1279, 1287 (10th Cir. 2007).

"Simply put, there are no established objective criteria or tests for assessing 'maturity' in the

context of the mature child exception, although the Second Circuit has observed as a general

matter that the standard should be a relatively demanding one." *Haimdas*, 720 F. Supp. 2d at

205 (internal citations omitted).

Generally, "[a] child's expression of a preference to remain in the United States rather

than a particularized objection to repatriation may provide a basis for a court to find the mature

child exception inapplicable." *Id.* at 206; *see, e.g.*, *Yang*, 499 F.3d at 279 (ordering repatriation

where the child "possessed a more generalized desire to remain in Pittsburgh similar to that of

any ten-year-old having to move to a new location . . . [and] such reasons were not necessarily

sufficient to invoke the exception"); *Falk v. Sinclair*, 692 F. Supp. 2d 147, 165 (D. Me. 2010)

("Expression of a *preference* to remain in the respondent's country is not enough . . . to disregard

the narrowness of the age and maturity exception to the Convention's rule of mandatory return."

(internal quotation marks omitted)); *Locicero v. Lurashi*, 321 F. Supp. 2d 295, 298 (D.P.R. 2004)

("The fact that the [13-year-old] child prefers to remain in Puerto Rico, because he has good

grades, has friends and enjoys sport activities and outings, is not enough for this Court to

disregard the narrowness of the age and maturity exception to the Convention's rule of

mandatory return."). In addition, "[t]he exception must not be applied where the opinion of the

child is the product of undue influence by either parent." *Matovski v. Matovski*, No. 06 Civ.

4259 (PKC), 2007 WL 2600862, at *10 (S.D.N.Y. Aug. 31, 2007).

2.      **Discussion**

      *a.*    *S.B.S.'s longstanding objections to living in Chile*

    In his *in camera* testimony, S.B.S. unequivocally objected to being returned to Chile. As he explained in detail, his objections are based on his lived experiences in Chile, where he felt "depressed," "sad," and "frustrated," Tr. 925–26, 949 (S.B.S.), and in the United States, where he has felt "happy," "support[ed]," "understood," and "safe," Tr. 882, 955 (S.B.S.); S.B.S. Summary ¶ 3.

    S.B.S.'s firm objections in his testimony did not come as any surprise. To the contrary, in communications to a range of persons dating to June 2022, S.B.S. forcefully and consistently expressed his deep discontent with his life in Chile, his yearning to leave, and, later, his relief to be in the United States. Since arriving to this country, he has repeatedly told the adults in his life, with emphasis and sometimes a measure of desperation, that he does not want to return to Chile and to lose the happier and more stable life he has built here with his father. S.B.S. has expressed these views despite the greater material comforts he enjoyed in Chile, where he lived with Swett in a spacious luxury apartment and had access to a large beach home, in contrast to the walk-up studio apartment he today shares with Bowe. And he has never wavered in these views, despite the turbulence of his intercontinental move—which has entailed a change of residence, school, and lingua franca—and the legal uncertainty of his situation. The durability, consistency, and clarity of S.B.S.'s objections to returning to Chile underscore that these are sincere, firmly held, and anchored in reason.

    As to the audiences to whom S.B.S. articulated these views, the Court finds that he first confided in his father about this subject. In daily or near daily Skype exchanges and video calls beginning in mid-2022, S.B.S. complained to Bowe about his unhappiness in Chile. *See, e.g.*, PX-4 at JB-1126 (Skype exchange on June 12: Bowe: "[S]undays are always hard

there." S.B.S.: "Monday's, Tuesday's Wednesday's, Thursday's Friday's Saturday's too."). S.B.S. identified the sources of this unhappiness as that: (1) he had an emotionally fraught and distant relationship with Swett, Tr. 986 (S.B.S.); (2) he felt socially isolated and lonely, with few friends and activities to occupy his time, Tr. 904 (S.B.S.); (3) his home life felt unstable because of a rotating cast of nannies who looked after him, Tr. 44 (Bowe); (4) he felt unengaged in school, Tr. 917–18 (S.B.S.); and (5) he deeply missed Bowe and felt his absence, Tr. 938 (S.B.S.). During that period, S.B.S. grew—and outwardly projected as—increasingly despondent and dejected. Bowe attested to a downshift in S.B.S.'s mood. Tr. 45 (dating change in S.B.S. to May 2022, when "he was so despondent" and "crying and crying and saying I can't take this"). So did S.B.S. *See* Tr. 934 (S.B.S.) ("[Bowe] could see I looked really depressed, and I wasn't saying much, but I also told him that I was really unhappy."); Tr. 935 (S.B.S.) ("[I]t was clear that I was unhappy while I was in Chile.").

Swett also perceived S.B.S.'s unhappiness in Chile, although she attributed it in large measure to S.B.S.'s missing Bowe, and dated it to September 2022. *See* Tr. 552; *see also* Tr. 854 (Swett) (Swett noticed change in behavior in 2022 when S.B.S. "was starting to feel and suffer more the sadness of saying goodbye to his father" and the "sadness started to last longer than it had before"); Tr. 855 (Swett) (describing "a lot of sadness," and need for "consolation, a lot of support, a lot of reassurance"). S.B.S. credibly testified that, after deliberately bloodying his arm in a school bathroom, he told Swett of his unhappiness. Tr. 937–38. The record is unclear whether S.B.S. at other times verbalized this to Swett.[17] But whether through verbal

---

[17] *Compare* Tr. 953 (S.B.S.) (S.B.S. "not sure" whether he told Swett he wanted to live in the United States), *with* Tr. 935 (S.B.S.) (S.B.S. "communicated to [Swett] in some way that [he] [was] not happy" while they were living in Chile together).

expressions or non-verbal cues, by September 2022, Swett had come to recognize her son's despondency. In a September 25, 2022 WhatsApp exchange with Bowe, she acknowledged S.B.S.'s "pain and suffering." *See* RX-14 at 2. And she admitted at trial that "I realized that S.B.S. needed a therapist in September [2022]," Tr. 859, although she never arranged for one, Tr. 859–60.

As S.B.S.'s mood declined, he sought support by telling other adults in Chile that he was deeply unhappy. S.B.S. testified that he had reported this to a teacher, Tr. 936; and he told Dr. Favaro that he had reported this to a teacher and a nanny, RX-89B at 1. On November 4, 2022, S.B.S. articulated his unhappiness with his life to Dr. Valenzuela, the Chilean psychologist whom Bowe arranged for S.B.S. to meet after S.B.S. began "verbalizing ideas of self-harm." PX-10 at 2. At that session, S.B.S. "spontaneously and directly declare[d] that he wants to live with his dad." *Id.* S.B.S. reported to Dr. Valenzuela feeling "lonely here (in Santiago)" and that "the loneliness bothers [him] as he never spends time with his mom, because she's always tired, depressed, and works a lot." *Id.* (cleaned up). He described feeling that he did not "matter to anybody." *Id.* S.B.S. told Dr. Valenzuela that he was reluctant to share his feelings with his mom out of "[f]ear that she'll blame [him] [if] [he] tell[s] her something she doesn't agree with." *Id.*; *see also* RX-51 at 2 ("[F]or a year now, I haven't felt like I can talk [to you]."); Tr. 933 (S.B.S.) (recounting not saying much to his mother about his feelings about Chile: "I think I was scared about how she would react. I was scared that she'd be mad at me.").

On a July 2022 visit to the United States, S.B.S. confided much the same to his paternal grandmother and aunt. He told Sonia that "[his] life in Chile [was] hell." Tr. 402 (Sonia). He complained about his school, where he was "not learning anything," his loneliness, and the instability of his living environment given the many nannies. Tr. 405 (Sonia). At one point,

S.B.S. was surprised that Sonia wanted to eat breakfast with him, noting that he "always [ate]

alone" in Chile. Tr. 402 (Sonia). Sonia took away the impression that S.B.S. "had a miserable

life" in Chile and felt "trapped" there. Tr. 405 (Sonia). On the same trip, S.B.S. told Marisa that

"he wanted to get out of Chile." Tr. 446 (Marisa).

   In December 2022, after leaving Chile with Bowe, S.B.S. recalled deep relief. Tr. 954

(S.B.S.) ("I [] remember us looking at each other knowing that I would not want to come back

and that we were not going to go back."). He felt "like [he had] escaped," that he "was out of

trouble," and that he was no longer in "pain." Tr. 954–55 (S.B.S.). In New York, S.B.S.

conveyed to Bowe that he was desperate not to return to Chile, and firmly stated that "[h]e didn't

want to go back." Tr. 118 (Bowe). S.B.S. told Swett the same in daily video calls after leaving

Chile. He repeatedly told her that, as reflected in a recorded call, "[he] can't go back to Chile,"

RX-53 at 6, because it felt "like a prison," RX-51 at 9, and that he "want[ed] to live here [*i.e.*,

New York]," RX-53 at 9. He begged Swett: "[C]an you please let me stay here? Please." RX-

56 at 3; *see also* RX-58 at 3 ("I want you to let me live here."). When Swett did not respond to

these pleas, S.B.S. expressed frustration, telling her that he had "been trying to tell [her] this for

one year" but that she "[didn't] listen to him." RX-51 at 5–6 (transcript of February 26 call). On

that call, Swett did not push back on that account. *See id.*

   S.B.S. made similar statements on numerous calls with Swett after he arrived in New

York. There is no evidence that he ever equivocated—or even once told her (or anyone else) that

he wished to return to Chile. The transcripts of the recorded calls reflect consistent statements

by S.B.S. bucking at the idea of returning to Chile. *See, e.g.*, RX-51 at 4 (Feb. 26, 2023) ("[I]n

Chile . . . it's hard for me to be at school. Every, every day I go home, and I'm alone, Mom. I'm

not with you."); *id.* ("But I can't go back there, Mom. I don't want to."); RX-52 at 6 (Mar. 2,

2023) ("It's just if I got to live there, I'm going to have depression."); RX-53 at 6 (Mar. 11, 2023) ("I've been telling you for 2 weeks that what I need is, that I can't go back to Chile."); *id.* at 8 ("Really, Mom? A house 2 minutes away from school will resolve things, the fact that I've had many bad experiences in Chile and that I don't want to come back? Seriously?"); *id.* ("I thought you'd be like, 'Oh, this is going to be hard, but I'm going to do this for my son, for him to have a good future, so that he isn't depressed and doesn't kill himself.'"); RX-55 at 5 (Apr. 17, 2023) ("When I got here, I was one year behind because I wasn't learning anything there."); RX-56 at 2–3 (Jan. 24, 2024) ("I want to live here. . . . So, can you let me stay here? Please?"); *id.* at 6–7 ("So, I want to know. You didn't know that I wanted to die? In Chile? . . . When I came home from school with that scratch on my arm."); *id.* at 8 ("I'm just saying, please let me be happy here, Mom, okay?"); RX-57 at 2 (Feb. 2, 2024) ("No, not a plan. I want you to let me live here."); *id.* at 7 ("No, mom. I wanted to kill myself in Chile. School was bad. I barely had any friends. I wasn't practicing any sports or seeing any friends. I'd stay inside the apartment all day. I decided that I couldn't keep living like that. And I missed dad a lot. And I couldn't do this."). S.B.S. articulated this position even while acknowledging that he misses his mother deeply—as she misses him. *See, e.g.*, PX-14 at 2 (April 29, 2023 email from Bowe to Sonia acknowledging that S.B.S. missed Swett); Tr. 979 (S.B.S.) ("I missed her, but I was really glad that I was away from Chile and that she wasn't my main parent and that I didn't have to rely on her anymore."); RX-89A at 7 (S.B.S. interview with Dr. Favaro on March 18, 2024) ("Well, I miss her but it's very complicated. Like, it's hard to explain but I miss my mom but sometimes I wish it wasn't so complicated with my mom.").

In communications with others since arriving in New York, S.B.S. conveyed his desire not to return to Chile.

To Dr. Attie, his treating psychologist, S.B.S. expressed a "fear of going back [to Chile] and losing everything [in the United States]." PX-12 at 13. He reported an "aloneness and sadness and [] unhappiness in Chile." Tr. 768 (Attie). Dr. Attie noticed that S.B.S. was "very anxious that something could happen, [and] that he would have to go back" to Chile. Tr. 769 (Attie). Dr. Attie persuasively opined that S.B.S. "would be devastated" if returned to Chile. Tr. 794. She added: "[S.B.S.] feels that this is where he wants to be and feels that he's growing and that he's developing and he really couldn't imagine going back to the same life there." Tr. 794–95.

To Dr. Favaro, the defense expert, S.B.S. unequivocally stated that "[he] want[s] to live here" and he "[did not] want to go back" to Chile. RX-89A at 23. S.B.S. stated that he "used to live with [his] mom and then [he] was unhappy and [he] didn't want to live there anymore." *Id.* at 4. Asked about what in Chile made him unhappy, S.B.S. responded:

> Well, school was really bad. Like it was bad, like the education. They didn't teach us like they didn't, they wouldn't make sure that students would understand things. There was one teacher that just gave everyone A's and never looked through the papers. . . . I had to change schools. I think three times. . . . Also, I didn't have that many friends. Like I maybe only had two and I would just go home and do nothing. I'd be lonely and I wouldn't do anything but also, I was unhappy with the way that my mom was dealing with things. Like we constantly had nannies coming and leaving and I really missed my dad so yeah. I was just really unhappy there.

*Id.* at 6. He complained that Swett "a lot of times . . . wouldn't know how to raise [him]" and "didn't know how to take care of [him]. There were a lot of things she just couldn't do." *Id.* at 8. He reported that "in Chile sometimes [he] felt it'd be easier if [he] just didn't have to feel any of this" and wondered what would happen "if [he] just jumped off the balcony." *Id.* at 12. In contrast, S.B.S. stated, when he "came here" (New York), he "stopped feeling that immediately," *id.* at 13; he became "very happy" because his "life here is so good" with his father and friends,

*id.* at 21, 23. S.B.S. felt it was "unfair" that Swett is "[trying] to take that away from [him]." *Id.* at 22.

To his fifth-grade teacher, Trauman, S.B.S. reported that he was "extremely depressed in Chile." Tr. 350 (Trauman).

To the school guidance counselor, Daniels, he reported "that he had had a very difficult life in Chile." Tr. 361 (Daniels).

To Marisa, S.B.S. presented as deeply distressed after a Skype call with Swett in spring 2023. "[A]fter he hung up, he just started almost screaming and sobbing and howling and like banging the pillow, banging the door." Tr. 448 (Marisa). Of Swett, he told Marisa: "I know she doesn't mean to hurt people, but she hurts everyone." Tr. 448 (Marisa). This "went on for a long time" and Marisa could feel that his "pain was just unbelievable, the intensity and the pain." Tr. 448 (Marisa).

Finally, to the Court, during its extended interview, S.B.S. forcefully objected to return to Chile, in language that tracked his remarks to others during the preceding two years:

> Q:   Do you prefer to stay in New York or go back to Chile?
>
> A:   Stay in New York.
>
> Q:   Why?
>
> A:   I didn't like my life in Chile.  I didn't like my mom having full custody of me.  I didn't like the school.  I didn't have friends [and] I didn't have a social life.

Tr. 980.  He added:

> I thought that she knew very well that I didn't want to live in Chile because I would hurt myself.  I was—to me I was very clearly unhappy with not much of a social life or a physical life or much of anything. . . . If she is well aware that I didn't like it there, why would she want me to go back?

Tr. 886. He recalled that in 2022: "I told [Bowe] that I was really depressed and that I did not want to be in Chile anymore. And he just kept saying I'm working on it. Every day that I called him, he'd just sa[y] I'm working on it." Tr. 934 (S.B.S.).

In his interview with the Court, S.B.S. also adopted the statement his attorney, Ms. Baum, had prepared with him. Tr. 987–88 (citing S.B.S. Summary). That detailed statement, which usefully synopsizes S.B.S.'s views, reads in relevant part:

> S.B.S. loves his mother, but there were problems when he lived with her in Chile, and he does not want to go back there, even to visit. In Chile, S.B.S. says he was lonely and depressed. S.B.S. felt like he was a seedling that wanted to grow, but there was a cup over him, keeping him in place and preventing him from seeing sunlight. He was becoming increasingly isolated and frustrated. He was sad about being alone, and he missed his father, a lot. S.B.S. does not want to hurt his mother's feelings, but he desperately does not want to return to Chile, or to live with his mother. As a result, S.B.S. is very worried about his future.
>
> . . .
>
> If he is sent back to Chile, S.B.S. feels that he is going to go back to his "weird life" that was unsettling and depressing for him. He did not like that life, for reasons he may not always have expressed perfectly but which are still good reasons. Moreover, if sent back to Chile, S.B.S. would no longer have the daily support of his father, who is the most important and reliable person in his life. Once again, no one would really be listening to him, and he would be left to navigate his complicated family on his own. Additionally, instead of exploring the things that make him happy and that let him grow and expand his world, he would be alone, again, taking Pilates, and longing for this rich and much happier life that he has right now. He is under stress, and he feels like crying just thinking about it.

S.B.S. Summary ¶¶ 3, 27.

S.B.S.'s assembled communications over time to a diverse array of persons—Chileans and Americans; kin and strangers; teachers and therapists; a lawyer and a judge—leave the Court with zero doubt about the durability and strength of his objection to return to Chile. S.B.S.'s convictions, the Court finds, are amply "particularized" and concrete. *Haimdas*, 720 F. Supp. 2d at 208. As S.B.S. summarized his perspective, in the United States, his needs—social, parental,

and educational—are being met. S.B.S. Summary ¶¶ 3–4. He feels "stable [in New York]";

whereas in Chile, he felt "like the ground [he]'d be standing on wouldn't be supported." Tr. 962

(S.B.S.). And these views are anchored in specific objections to Chile, arising from his social

isolation, unsatisfactory educational environment, emotional detachment from his mother, and

physical distance from his father, to whom he feels far more connected and by whom he feels

better understood.

S.B.S.'s situation is thus the antithesis of a situation in which a child expresses a "simple

preference for the luxuries of living in New York." *In re Skrodzki*, 642 F. Supp. 2d 108, 118

(E.D.N.Y. 2007). Quite the contrary: for S.B.S., the more lavish lifestyle would be in Chile. His

mother is a successful actress with a large high-rise apartment in Santiago, a spacious vacation

home in a nearby beach town, and the established earning capacity to hire live-in nannies and to

fund regular weekend Uber Eats breakfast deliveries. Tr. 887, 892, 902, 904 (S.B.S.).[18] That

S.B.S. prefers to live with his father in a walk-up studio apartment, in which the two work side-

by-side at a common desk, underscores that his draw to this country is anchored in substance, not

extravagances or superficialities. *See, e.g.*, *Laguna v. Avila*, No. 07 Civ. 5136 (ENV), 2008 WL

1986253, at *11 (E.D.N.Y. May 7, 2008) (finding child had valid objections to repatriation

where he "testified that he had had no real friends in Colombia and had performed poorly in

school" and "believes that the United States will provide him personally with far better

opportunities in life"); *Diaz Arboleda v. Arenas*, 311 F. Supp. 2d 336, 343–44 (E.D.N.Y. 2004)

(finding that children ages 12 and 14 sufficiently objected to return where they expressed

---

[18] Swett's financial situation declined with diminished acting opportunities during the pandemic, prompting her to write Bowe in September 2022 that she was too cash-strapped to pay for a hotel and airfare during a planned visit to New York. RX-12 at 2. She testified that she is selling certain real estate she owns in Santiago. Tr. 663. Nonetheless, her accommodations and long-term earning capacity clearly outstrip Bowe's.

preference to stay with their mother and believed they would have better opportunities in United States); *Matovski*, 2007 WL 2600862, at *14–15 (finding that children ages 11 and 12 sufficiently objected to return where they testified that they had more family and friends, and a more stable life, in the United States, and fear uncertainties they would face in home country).

The Court carefully considered Swett's argument that S.B.S.'s objections to return to Chile are the "product of undue influence" by Bowe. *D.T.J.*, 956 F. Supp. 2d at 542. Swett's expert, Dr. Favaro, so opined, terming S.B.S.'s objections the product of "manipulation" and "intense influence by the father." Tr. 1153; PX-116 at 16 (Favaro's expert report). The Court rejects that conclusion. It is undeniable that Bowe long strongly believed that his son was hurting in Chile and would thrive in the United States. It is also undeniable that Bowe repeatedly wrote and said as much to S.B.S., in pungent prose that sometimes crossed into caustic critiques of Swett and, derivatively, Chile. Bowe's words surely had the capacity to sway an undecided child.

But that does not describe S.B.S. The record instead supports that S.B.S.'s despair and views about life in Chile were independent and long-standing. These, and S.B.S.'s desire to be in New York with Bowe, demonstrably trace to a time when S.B.S. was living full time with Swett, and when Bowe's in-person contact was limited to occasional visits. Based on lived experience, the Court finds, S.B.S. developed a strong conviction that his life in Chile was destined to remain sad and that he belonged in the United States. Bowe's views undoubtedly reinforced S.B.S.'s; and S.B.S.'s connection to Bowe undoubtedly strengthened the attraction of the United States. But the Court rejects—as deprecating S.B.S.'s capacity for independent thought—Dr. Favaro's suggestion that when S.B.S. for two years expressed anguish about life in Chile, and when he bloodied his arm in a school bathroom out of frustration, he was driven by

manipulation as opposed to authentic emotion. The Court finds that S.B.S.'s unhappiness in Chile was rooted in genuine perceptions about the downsides of his life there: loneliness, sparse friends, an emotionally distant maternal relationship, a physically distant father, long stretches in the care of nannies, and uninspired schooling. S.B.S.'s objections to Chile, the Court thus finds, are genuine and "the product of independent reasoning." *Matovski*, 2007 WL 2600862, at *14.

In so holding, the Court does not minimize Bowe's communications demeaning and undermining Swett. These messages were inappropriate for any child, let alone a struggling 10-year-old. The Court returns to Bowe's failings below in discussing whether equitable factors compel S.B.S.'s return. But the Court rejects that Bowe's words caused S.B.S.'s distress. And the Court rejects that S.B.S.'s testimony—or his earlier statements to the same effect to so many others—were the "product of coaching or undue influence" by Bowe. *Id.* at *15; *see, e.g.*, *Laguna*, 2008 WL 1986253, at *10–11 (although statements to child about the "damaging consequences for his mother should the Court order his return to Colombia," including that she "stands to lose a lot of money if she loses this case," "greatly concern[ed] the Court," it nonetheless found that the child's "reasoned testimony . . . represents his honest opinions and wishes and was not the product of his parents' influence"); *Blondin v. Dubois*, 78 F. Supp. 2d 283, 296 (S.D.N.Y. 2000), *aff'd*, 238 F.3d 153 (2d Cir. 2001) (although child might have been coached by mother to some degree, her objection to being returned was not the product of mother's "undue influence"); *D.T.J.*, 956 F. Supp. 2d at 542 (although respondent "is a strong proponent of remaining in the United States and has communicated as much to D.T.J.," "D.T.J.'s fervently expressed opinions, and her desire to remain in the United States, appeared clearly to be entirely her own").

In sum, the Court finds that S.B.S.'s desire not to be returned to Chile, and to remain in the United States, is the product of his own mind and grounded in experience. The Court finds, emphatically, that S.B.S. "objects to being returned" to Chile.

### b.    S.B.S.'s age and maturity

The Court further finds S.B.S., who is two months shy of age 12, to be of sufficient age and easily to be of sufficient maturity for his views about return to be given weight.

The caselaw has not developed "any established objective criteria or tests assessing a child's maturity for purposes of the Hague Convention." *Rubio*, 2019 WL 5189011, at *19. And "there is no precise age at which a child will be deemed sufficiently mature under the Convention." *Laguna*, 2008 WL 1986253, at *9.[19] "Rather, the child's maturity is a question for the district court, to be determined upon the specific facts of each case." *Id*. This "often turn[s] on the *impression* a child left on the court through [his] testimony, demeanor, and mannerisms." *Rubio*, 2019 WL 5189011, at *19. Here, the Court bases its finding largely on its three-and-a-half-hour interview of S.B.S., during which the Court paid close attention both to the substance of S.B.S.'s answers and to his comportment. But the Court was attentive to the assessments of others, including S.B.S.'s teachers, treating psychologist, parents, relatives, and family friends. All testified, in essence, that S.B.S., for a boy his age, is unusually bright, considerate, purposeful, and mature. *See, e.g.*, *Laguna*, 2008 WL 1986253, at *11 (basing age and maturity analysis primarily on child's *in camera* testimony); *Porretti*, 2019 WL 5587151, at *11 (same).

---

[19] *See, e.g.*, *Cruvinel v. Cruvinel*, No. 19 Civ. 4237 (LDH) (SIL), 2022 WL 757955, at *5 (E.D.N.Y. Jan. 10, 2022) (13-year-old found sufficiently mature); *Matovski*, 2007 WL 2600862, at *14–15 (11- and 12-year-old found sufficiently mature); *In re D.A.*, No. 14 Civ. 5836 (PKC), 2015 WL 2344079, at *6 (E.D.N.Y. May 14, 2015), *aff'd sub nom. Adamis v. Lampropoulou*, 659 F. App'x 11 (2d Cir. 2016) (12-year-old found sufficiently mature).

The Court's lengthy conversation with S.B.S. covered a wide range of subjects. These primarily related to his experience living in Chile with Swett, his experience living in New York with Bowe, and his goals and aspirations. S.B.S. presented as thoughtful, intelligent, poised, and direct. Based on his answers and demeanor, S.B.S. conveyed that he appreciated the solemnity of the occasion, the need for care, and the imperative of telling the truth.

S.B.S. coherently articulated his objections to returning to Chile and his reasons to want to remain in the United States. The Court found S.B.S.'s reasoning, in the main, sensible, well-analyzed, and grounded in experience. And the views to which he testified tracked those he had told others. Explaining his unhappiness in Chile, S.B.S. noted his challenging relationship with Swett, his physical distance from his father, his crimped social life, and his unsatisfying school experience; explaining his desire to remain in New York, he noted his larger friend group and social life, his contentment living with Bowe, and the stimulating and challenging education he is receiving and stands to receive. *See generally* Tr. 899–906, 942, 955–958. The constancy and coherence of S.B.S.'s views underscores that these are not passing fancies. The Court was left with a firm conviction that S.B.S. knows his own feelings and is at peace with them. He presented as an astute and observant child who has come to his views based on reflection. *See, e.g., Gross*, 2024 WL 1367957, at *6–8 (finding mature child defense to apply where child "strenuously objects to returning to England"; "has articulated the reasons for his objections"; and his "reasons are apply supported in the record"); *Demaj v. Sakaj*, No. 09 Civ. 255 JGM, 2013 WL 1131418, at *25 (D. Conn. Mar. 18, 2013) (finding mature child defense to apply where child "answered all of the questions posed to her" and "was able to express a preference on where she wished to live based on a reasonable comparison of her life in Italy and her life in the United States").

58

To be sure, there were aspects of S.B.S.'s testimony that pointed in the opposite direction as to his maturity. The Court probed, and carefully scrutinized S.B.S.'s testimony, for evidence of undue influence by Bowe, mindful of Bowe's Skype writings to S.B.S. and Swett's claims of manipulation. There were indeed moments in which S.B.S.'s word choice, and his critiques of Swett, appeared to emanate from Bowe. S.B.S.'s description of his mother as having engaged in "gaslight[ing]" in Chile, for example, was a locution that almost certainly derived from an adult's account. *See* Tr. 983–84. And S.B.S. admitted that his disparaging view of his mother's mental health derived, in part, from Bowe's statements. Tr. 884–85 (S.B.S.). S.B.S. at points also overstated his critique of life in Chile. He was reluctant to concede happy or positive moments there. And he improbably declared that, if permitted to live in New York, he would never visit Chile. Tr. 980. Such exaggerated testimony presented as outcome-driven, reflecting the depth of S.B.S.'s desire to persuade the Court not to order his return. But on balance, the Court found S.B.S.'s responses thoughtful, reflective, and genuine. The Court also appreciated S.B.S.'s capacity to acknowledge when he did not know the answer to a question. *See, e.g.*, Tr. 897, 984; *see also,, e.g.*, *D.T.J.*, 956 F. Supp. 2d at 540 (finding child sufficiently mature even though "the Court perceived noticeable areas of emotional immaturity").

Testimony from other witnesses corroborated the assessment of S.B.S. as mature and thoughtful for his age. Much was to the effect that S.B.S. has approached his education with purpose. At school, he has shown an appealing hunger to learn and advance. Trauman described him as thriving academically. At the school year's start, S.B.S. was "slightly below some grade standards and meeting some grade standards," but today, due to hard work, he is "exceeding almost all grade standards and meeting others." Tr. 314–15. She called S.B.S. "one of the most articulate," "motivated," and "driven students" she has taught, and punctual, responsible, driven,

diligent, conscientious, and mature. Tr. 314. Impressively, upon learning of Hunter Middle

School, a selective public school, S.B.S. began diligent preparation for an end-of-year exam

bearing on admission, and has worked closely with Trauman outside of school to prepare. Tr.

323–26 (Trauman); *see, e.g., Porretti*, 2019 WL 5587151, at \*8 (finding impressive children's

"poise, breadth of interests and ambition" and that child "went so far as to identify specific

educational opportunities she hopes to achieve . . . that are only available in the United States").

    S.B.S.'s social maturity and poise were also underscored by his response, as recounted by

Trauman and school counselor Daniels, to a sensitive incident at P.S. 41, in which friends of his

made racist comments. *Id.* at 327–28. S.B.S. recognized that the language used was racist and

told his friends "it wasn't okay" to make that kind of comment. Tr. 327–28 (Trauman); *see also*

Tr. 373 (Daniels) ("[H]e seems to understand . . . this concept of racism and what's crossing the

line."). When his friends failed to grasp the problem, S.B.S. alerted Trauman. Daniels met with

S.B.S. two to three times to discuss the incident. Tr. 357. An ensuing investigation revealed that

such comments had gone on for several months. S.B.S. was the only student "to bring it to an

adult's attention." Tr. 328 (Trauman). The situation resolved amicably, via workshops "around

bias and racism," Tr. 329 (Trauman), and the students involved reconciled, Tr. 360 (Daniels).

S.B.S.'s teacher and counselor were struck by his instinct to do the right thing, to approach a

problem diplomatically, to stand up for a friend, and to speak up, notwithstanding risk to his

social standing. *See* Tr. 328 (Trauman) ("He was very concerned about . . . the other student.");

Tr. 374 (Daniels) ("[S]ome kids [] were upset that he was telling the truth about what had been

going on. [S.B.S.] wasn't too bothered by that."). Daniels was "very taken by his maturity [and]

insight," which was beyond that of "a typical 5th grade boy." Tr. 360 ("He had an awareness that

a lot of the other kids did not have."); Tr. 373 ("He is much more mature than other boys his age."). Trauman testified: "I haven't seen many [boys] this mature." Tr. 439.[20]

Every witness who had met S.B.S., in fact, described him in admiring terms, with many noting his maturity and articulateness. Swett described S.B.S. as "a mature child since he's five. . . . [E]veryone has been very surprised by his maturity. . . . [P]eople have said it is surprising and inexplicable." Tr. 866; *see* Tr. 523 ("He's very empathic, generous, very understanding, sensitive, and very intelligent."). Sonia described S.B.S. as having "a very strong sense of self" and "very clear-eyed." Tr. 416. Marisa called S.B.S. "innately quick and bright and curious about everything," "honest," and "unusually mature for his age." Tr. 453. Lyon called S.B.S. "very mature" and noted that he had "handled a lot with great poise." Tr. 390. Alarcon, the Chilean teacher, testified that S.B.S. "would give me the names of the students who were misbehaving or weren't doing their class work or their homework properly" and "remind his fellow students of how they should behave because he was a class president." Tr. 1087 (describing S.B.S.'s behavior as unusual as "he was very concerned that his classmates be able to learn and to learn himself . . . at that age children like to play rather than study"). Dr. Attie found S.B.S. "beyond his years in being able to articulate things," although in other ways, "a regular 11-year-old." Tr. 791–92. Dr. Favaro found him "extremely articulate." Tr. 1153.

For the above reasons, the Court finds S.B.S. of sufficient age and maturity for his views to be taken into account and given substantial weight. Based on S.B.S.'s strong and durable objections to repatriation, the Court finds that Bowe has successfully made out the Article 13 affirmative defense by a preponderance of the evidence.

---

[20] Daniels, a counselor for 18 years, has a master's degree in psychology and a certificate in school counseling. Tr. 354–55. Trauman, a teacher for 18 years, has a master's degree in childhood education. Tr. 313.

### C.   Well-Settled Affirmative Defense

Under Article 12 of the Hague Convention, a court may decline to order the return of the child if: (1) the proceeding seeking the child's return was commenced more than one year after the date of the wrongful removal or retention; and (2) the respondent has shown by a preponderance that the child is settled in his new environment.  The "well-settled" defense "grew out of the understanding of the framers of the Convention that there could come a point at which a child would become so settled in a new environment that repatriation might not be in its best interest." *D.T.J.*, 956 F. Supp. 2d at 533 (citation and internal quotation marks omitted).

### 1.   Commencement of Proceeding More Than a Year After Wrongful Retention

#### a.   *Applicable legal principles*

The "well-settled" defense is available "only when the proceedings were commenced more than a year after the date of the wrongful removal or retention of the child." *Lomanto*, 2023 WL 4118124, at *11; *see* Hague Convention, art. 12 ("The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.").[21]  To evaluate this

---

[21] Article 12 states that where a child has been wrongfully removed or retained and "at the date of the commencement of the proceedings before the judicial [] authority . . . a period of *less than one year* has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith." Hague Convention, art. 12.  The language that sets out the well-settled defense, however, states that the "judicial [] authority, even where the proceedings have been commenced *after the expiration of the period of one year* . . . shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment." *Id.*  The case-law statements to the effect that, for the defense to be available, "more than one year" must have elapsed derives from this treaty language. *Lozano*, 697 F.3d at 51.  Considering these two Article 12 provisions side-by-side, there is arguably room for debate whether the well-settled defense is available when *exactly one year* has passed since the act of wrongful removal or retention.  The Court does not have occasion to resolve that question here.

defense, the Court must first determine when the one-year period began to run.  Fixing that date is usually straightforward in cases of a child's wrongful removal, but it can be more challenging in cases like this, involving wrongful retention.

The wrongful retention of a child "is a singular and not a continuing act." *Marks ex rel. SM v. Hochhauser*, 876 F.3d 416, 420 (2d Cir. 2017).  "The fixing of the decisive date in cases of wrongful retention should be understood as that on which the child ought to have been returned to [his or her] custodians or on which the holder of the right of custody refused to agree to an extension of the child's stay in a place other than that of its habitual residence." Pérez-Vera Report ¶ 108.

In some wrongful retention cases, like this one, a petitioner "initially consent[s] to the child's travel with respondent" and "set[s] a fixed return date." *Taveras*, 22 F. Supp. 3d at 232. In such cases, the retention becomes "wrongful" as of the fixed date "on which the child ought to have been returned to [his or her] custodians." Pérez-Vera Report ¶ 108; *see, e.g., Demaj*, 2013 WL 1131418, at *3, *7 (where respondent told petitioner she was taking children for one month, retention became wrongful when children were not returned at end of one month); *Velasquez v. Green*, No. 12 Civ. 66, 2012 WL 2885662, at *7 (E.D. Tex. July 13, 2012), *report and recommendation adopted*, 2012 WL 6569792 (Dec. 14, 2012) (where petitioner allowed child to visit for winter holiday, retention became wrongful when child was not returned by time child's classes resumed in January).  However, the petitioner may "consent to an extension of the child's stay, in which case the retention becomes wrongful at the conclusion of the extension." *Taveras*, 22 F. Supp. 3d at 232; *see In re Cabrera*, 323 F. Supp. 2d 1303, 1312–13 (S.D. Fla. 2004) (when child was "supposed to return" by March 2002 but the parties "made certain arrangements

relating to the child finishing school and then returning," retention not wrongful until the later date).

In other cases, when there was no fixed date for the child's return, it becomes more "difficult to determine when the child 'ought to have been returned.'" *Taveras*, 22 F. Supp. 3d at 233 (quoting Pérez-Vera Report ¶ 108)). Some courts have held the wrongful retention date to be that when the respondent "ma[kes] it clear" that the child "would be permanently residing" in another country. *Darin v. Olivero-Huffman*, 746 F.3d 1, 10 (1st Cir. 2014) ("mid-March 2011" was the date of wrongful retention because respondent then "made it clear to [petitioner] that she and their son would be permanently residing in the United States"); *Hochhauser*, 876 F.3d at 422 (wrongful retention date was date "when [respondent] advised [petitioner] that she would not be returning with the Children to Thailand"). Others have held that "the retention date is the date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof." *Blackledge v. Blackledge*, 866 F.3d 169, 179 (3d Cir. 2017).

> *b.    Discussion*

The retention date here is disputed and necessary to establish. The candidates are January 8, 2023, and February 23, 2023.

Swett argues for the later date. She acknowledges that Bowe wrongfully retained S.B.S. in the United States on January 8, 2023, and that S.B.S. "ought to have been returned" that day. On January 8, 2023, Bowe refused to return S.B.S. to Chile, contravening the travel authorization order Swett had signed that unambiguously—and over Bowe's objection—obliged him to return S.B.S. to Chile that day. In seeking to push the retention date later, Swett argues that she later

acquiesced in Bowe's retaining S.B.S. through February 26, 2023.  Swett notes that even before

Bowe and S.B.S. left Chile for New York on December 23, 2022, she had stated her intention to

authorize Bowe and S.B.S.—after they arrived in Chile on January 8, 2023 and spent several

days there—to return to the United States and stay until late February, when S.B.S. was needed

in Chile for the school year beginning in early March.  For S.B.S. to stay with Bowe until late

February, Swett notes, would have tracked the pattern from prior years in which S.B.S. had spent

the Chilean summer holiday with Bowe.  Swett explains that she had insisted Bowe return S.B.S.

to Chile on January 8 for the limited purpose of enabling her and Bowe to discuss, in person,

S.B.S.'s future, in light of the their heightened discord since Swett's December 1 discovery of

the chat of violence.[22]  To support her claim of such acquiescence, Swett relies on her emails to

Bowe acknowledging that S.B.S. would remain with him until February 26, 2023.[23]  Swett

relatedly notes that she had had a longstanding plan to attend a wedding in Mexico for a week

during February 2023, which made it sensible for Bowe to then have custody of S.B.S.[24]  Swett

thus argues that although Bowe's retention of S.B.S. after January 8 was initially wrongful, his

---

[22] *See, e.g.*, Tr. 568 (Swett) ("the plan was always for S.B.S. to spend the month of February with [Bowe]"); PX-49 at 1 (January 5, 2023 email from mediator Roa noting Swett's intention that Bowe and S.B.S. "[c]ome back on Sunday [to Chile] to sign a travel permit and commitment to do the mediation in March.  After that, [Bowe] and [S.B.S.] can fly back to the States to continue [S.B.S.'s] vacation until a date decided by [Swett].").

[23] *See, e.g.*, PX-75 at 2 (January 9, 2023 email from Swett to Bowe, stating, "As you're making new plans, I just want you not to forget to bear in mind that I won't be in Chile in February until the 18th."); PX-7 at 3 (January 21, 2023 email from Swett to Bowe, stating that because "[S.B.S.'s] starts school on March 1st," she "need[ed] him to arrive in Chile, please, on Sunday a.m., February 26th."  Bowe responds: "Yes, I understand this"); RX-45 at 2 (February 22, 2023 email from Swett to Bowe, stating that "I can be certain that [S.B.S.] will come back home with me this Sunday [February 26, 2023], right?").

[24] *See, e.g.*, Tr. 638 (Swett) ("I had told [Bowe] ahead of time that I had a wedding for one week in Mexico"); Tr. 568 (Swett) (in February she "went to a wedding abroad, which was, of course, planned in advance").

continued retention later became permissible, based on her consent in the days after. She argues that Bowe's retention of S.B.S. became wrongful again on the morning of February 23, 2023, when Bowe, during the remote mediation, unambiguously conveyed to Swett his firm decision not to return S.B.S. to Chile. Because her Petition in this case was filed on February 23, 2024, one year to the day later, Swett argues, the pre-petition retention lasted for one year, not "more than one year," blocking Bowe from pursuing the well-settled defense.

Bowe argues for January 8, 2023. He notes that his retention of S.B.S. and refusal to return him that day was unambiguously wrongful. He argues that his retention of S.B.S. thereafter never became lawful. He notes that, on January 8, in a video call after Bowe had stated that he would not be returning S.B.S. that day, Swett, had "beg[ged] [Bowe] to bring S.B.S. back," but Bowe refused. Tr. 636 (Swett). That Swett later acceded to the inevitability of Bowe's retention of S.B.S. until late February, Bowe argues, did not change the retention's wrongful nature. *See* Tr. 864 (Swett) (acknowledging that after January 8, it was clear that "Bowe will keep S.B.S. until the end of February . . . [n]o matter what," and that, after January 8, had she asked Bowe to bring S.B.S. back before late February "he would [have said] no").

Whether Swett's post-January 8 statements ostensibly consenting to S.B.S.'s staying in the United States made the retention no longer wrongful and push the wrongful retention date until February 23 presents an unusual fact pattern in the reported cases. No case the parties cite addressed this question in the posture here: where the respondent retained the child after the date fixed for the child's return, and where the communications claimed to represent the aggrieved parent's consent postdated that act of wrongful retention. The cases finding that the petitioner consented to an extension have tended to involve consent before the date when the child's return was required. *See, e.g.*, *Darin*, 746 F.3d at 6 (although "[a]t the outset of the trip, the plan was to

spend some time in Puerto Rico with [respondent's family] and then fly back to Argentina on March 2, 2011[,] . . . during their stay in Puerto Rico, the plan began to change and the date of return was pushed back due to [respondent's] involvement in a car accident and her apparently new-found interest in pursuing a business venture with her sister."). And the cases finding wrongful retention based on a respondent's clear statement of intent to permanently retain the child have not involved a prior unambiguous act of wrongful retention. *See, e.g., Lomanto*, 2023 WL 4118124, at *2–3 (respondent's August 24, 2021 statement that children would not be returning to Spain on agreed return date of August 28, 2021 marked the end of consent to the later date); *Hochhauser*, 876 F.3d at 422 (citing with approval State Department analysis that the "archetype of [wrongful retention] is the refusal by the noncustodial parent to return a child at the end of an authorized visitation period," and finding October 7, 2015 the wrongful retention date based on respondent's statement that day that "she would not be returning with the Children to Thailand," vitiating the parties' prior agreement that children "return to Thailand on October 10, 2015").

The Court does not doubt that, conceptually, under the Hague Convention, after an act of wrongful retention, the aggrieved parent can meaningfully acquiesce in or consent to the other's continued retention of the child, so as to end that period of wrongful retention and require a new act of wrongful retention to trigger the well-settled defense's one-year clock.[25] But on the facts

---

[25] Indeed, Article 13(a) of the Convention contains affirmative defenses of "acquiescence" and "consent," although Bowe cannot assert either here given the universal acknowledgement that his retention of S.B.S. from February 23, 2023 was wrongful and opposed by Swett. The "defense of acquiescence has been held to require 'an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time.'" *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005) (citation omitted). Acquiescence "turns on the subjective intent of the parent who is claimed to have acquiesced." *Id.* Consent "need not be expressed with the same degree of formality as acquiescence in order to prove the defense under article 13(a)." *Id.*;

of this case, Swett's capitulation to Bowe's retention and non-return of S.B.S. after January 8, 2023 cannot be found to meet any possible standard of acquiescence or consent.

In the notarized travel authorization form she signed on December 23, 2022, Swett had unambiguously set January 8 as S.B.S.'s return date, and granted Bowe permission to remove S.B.S. from Chile only until that date.[26] And, as January 8 approached, she repeatedly resisted Bowe's attempts to eliminate his duty to return the child by that date. In a remote meeting with Bowe on January 5, Swett pressed for Bowe to return S.B.S. on January 8, while promising that if Bowe did so and consented to a mediation in March, she would sign another travel permit. PX-49 at 1. At that meeting, she stated that her "decision [was] final." *Id.* That day, she emailed Bowe to reiterate the point, stating: "You left Chile KNOWING you had a 'Christmas trip' authorization with a return date of January 8." PX-68 at 2. In a January 6 email to Bowe, Swett again stated that S.B.S.'s "departure and arrival dates" are "very clear"—as she had authorized Bowe to take S.B.S. to New York and "bring him back to his home on January 8." PX-77 at 2. On January 8, when Bowe "ask[ed] for permission to extend[] the vacation," Tr. 109 (Bowe), Swett again "did not give him permission to extend the stay in the United States," Tr. 636 (Swett). Both parties understood that by not returning S.B.S. on the agreed-upon return date, Bowe had clearly breached the travel authorization and thereby the parties' custody order, and that Bowe also might be breaking the law. Tr. 110 (Bowe) ("I was violating something,

---

*see also Kosewski v. Michalowska*, No. 15 Civ. 928 (KAM) (VVP), 2015 WL 5999389, at *15 (E.D.N.Y. Oct. 14, 2015); *In re Kim*, 404 F. Supp. 2d 495, 516 (S.D.N.Y. 2005) (consent turns on petitioner's "subjective intent").

[26] PX-43 at 3 ("I expressly authorize my son [S.B.S.], minor, to travel from Chile to the United States, from December 23, 2022, until January 8, 2023, in the company of his father [Bowe].").

violating the agreement, violating Chilean law, I didn't know."); Tr. 567 (Swett) (Bowe had "just committed something illegal.").

Thereafter, the Court finds, Swett did not volitionally acquiesce or consent to Bowe's continued retention of S.B.S. Lacking any practical ability to control Bowe's decision whether and when to return S.B.S., she at most begrudgingly acceded to the inevitable: that Bowe would keep S.B.S. in New York until late February, as he had repeatedly sought leave to do. Swett never retracted the earlier travel authorization or executed a new one. To the contrary, after unsuccessfully "begging" Bowe on January 8 "to bring S.B.S. back," Tr. 646 (Swett), Swett, on January 10, filed a police report in Chile stating that S.B.S. not been returned to Chile as required by the travel authorization. Tr. 638 (Swett). *Cf. Lomanto*, 2023 WL 4118124, at *12 (wrongful retention date was the date a police report was filed, as that is when petitioner "refused to agree to an extension of the [children's] stay"). And on January 15, in WhatsApp messages to Bowe, Swett recounted the events of January 8: "Last Sunday [January 8] at almost the same time, I received a message from you here that . . . my son wasn't coming back. The pain left me on the floor on my knees. I still haven't been able to recover from that." RX-38 at 1–2. These actions and words do not align with Swett's portrait in this litigation, in attempting to pretermit Bowe's well-settled defense, of voluntary consent.

Tellingly, when questioned by the Court on this point, Swett acknowledged that she had not had any choice but to capitulate to Bowe's retention of S.B.S. through late February, because Bowe was clearly intent on keeping S.B.S. until that date with or without her permission:

Q: When you said that you agreed that Mr. Bowe could keep S.B.S. until the end of February, did you feel you had a choice or did you feel that Mr. Bowe was going to keep S.B.S. in the United States until the end of February no matter what?

A: That Mr. Bowe will keep S.B.S. until the end of February.

Q:    No matter what?

A:    Yes.

Q:    You believed that Mr. Bowe had violated your travel authorization when he
      didn't return S.B.S. on January 8th, correct?

A:    Yes.

Tr. 864.

That perception on Swett's part was plainly correct. Beginning January 8, Bowe had

made crystal clear his intention not to return S.B.S. to Chile until late February. And Swett,

thousands of miles away and confronted with the fact of S.B.S.'s kidnapping, did not have any

realistic means to secure S.B.S.'s return before then. Insofar as Swett portrays her later emails

acknowledging that Bowe would retain S.B.S. through late February—for example, her January

9 email reminding Bowe that she would be out-of-town for a wedding until February 18, and her

January 21 email reminding Bowe that S.B.S. needed to be in Chile on February 26 for the new

school year—as part of an agreement with Bowe, Swett did not receive anything in return for

any acquiescence. There was no quid for Swett's quo. At most, Swett's cessation of resistance

had the potential, by lowering the temperature of the dispute, to make Bowe more likely to return

S.B.S. in late February as opposed to holding him longer.[27]

Finally relevant to this issue, after January 8, neither parent had any firm belief that Bowe

would return S.B.S. on February 26, as Bowe much earlier had promised to do. Bowe credibly

---

[27] For these reasons, were the evidence as to this point evaluated under the standards used in
applying the Article 13 defenses of consent and acquiescence, *see* note 25, *supra*, it would not
avail Swett. Consent turns on the petitioner's subjective intent, *id.*, and the Court finds Swett not
to have consented before January 8 to Bowe's unbroken retention, and thereafter merely to have
bowed to the inevitable. Acquiescence requires a higher degree of formality, *id.*, a standard also
not met.

testified that starting well before January 8 and continuing throughout the February 23 when he

told Swett he was not returning S.B.S., he was considering a range of options, including keeping

S.B.S. indefinitely. *See, e.g.*, Tr. 104 (at the time he left Chile with S.B.S. on December 23,

2022, he was considering "about 50 options"); Tr. 110 (on January 8, he was "considering 50

different options" and "didn't have any intention or desire to bring [his] son back to a place

where he wanted to kill himself"). Swett, for her part, credibly testified that, although she hoped

that Bowe would return S.B.S. on February 26, she did not know for certain whether he would

do so. *See, e.g.*, Tr. 650 ("I am convinced that he would be coming on Sunday until they say

he's not, but I'm always afraid that [Bowe] will come up with some new surprise."); Tr. 650

(when she received Bowe's email on February 23 regarding a possible mediation, Swett "became

scared" and did not "know what kind of surprise he would give me"). Consistent with this,

Bowe's communications with Swett during this period consistently ducked making a firm

commitment to return S.B.S. as scheduled. *See, e.g.*, RX-45 at 1–2 (Swett asks Bowe twice over

email on February 22 whether she "can be certain that [S.B.S] will come back home with [her]

on Sunday [February 26]"; Bowe does not respond); PX-33 (Swett asks Bowe via a WhatsApp

message on February 21 whether she "can rest easy that [her] son will come home on Sunday

[February 26]"; Bowe does not respond).

  The Court thus finds January 8, 2023, the date of wrongful retention. At no point

thereafter did Bowe's retention of S.B.S. cease being wrongful. Because Swett filed her Petition

on February 23, 2024—some 411 days later—the well-settled defense, premised on the life

S.B.S. has built in New York since January 8, 2023, is available for Bowe to pursue.

  In the interest of completeness, the Court briefly considers an alternative argument of

Bowe's towards this outcome. Bowe argues that, even if the date of wrongful retention were

February 23, 2023, Swett's Petition was filed too late on February 23, 2024, to block a well-settled defense. Swett's Petition, Bowe notes, was filed in this District at 11:22 a.m. Eastern Standard Time ("EST") on February 23, 2024. RX-74 (time-stamped ECF filing). But, Bowe notes, the mediation at which he conveyed his refusal to return S.B.S. came earlier on February 23, 2023, as the mediation was held between 9 a.m. and 10 a.m. EST. Tr. 664–65 (Swett) (mediation was between 11 a.m. and noon Chile time, which, in February, is two hours ahead of EST). Thus, Bowe argues, the Petition was filed—by an hour or two—"more than a year" after his retention became wrongful.

Were the availability of a well-settled defense to turn on this theory, the Court would hold with Swett. The Hague Convention and ICARA do not specify a method of computing time for the purposes of measuring "the period of one year" that must pass for a well-settled defense to be available. *See* Hague Convention, art. 12; *see also* 22 U.S.C. § 9003(e)(2)(B). Federal Rule of Civil Procedure 6(a) fills this void. It supplies rules for "computing any time period specified . . . in any statute that does not specify a method of computing time." Fed. R. Civ. P. 6(a). In computing time, for a "period stated in days or a longer unit," Rule 6 requires the Court to "exclude the day of the event that triggers the period." Fed. R. Civ. P. 6(a)(1). Salient here, in "defin[ing] the "last day," Rule 6 provides that that "[u]nless a different time is set by a statute," "the last day ends for electronic filing, at *midnight* in the court's time zone." Fed. R. Civ. P. 6(a)(4) (emphasis added). Applying these rules, had the wrongful retention date been February 23, 2023, Swett's Petition would have been filed within one year, and not more, of that date. *See, e.g., Falk*, 692 F. Supp. 2d at 164 (because Hague Convention "is silent as to the methodology by which [the well-settled one year period] is to be calculated," "there is no conflict in use of the methodology supplied by Rule 6"; court holds that "calculation of the one-

year period in accordance with Rule 6 reveals that the Petition was timely filed"); *Gonzalez v. Preston*, 107 F. Supp. 3d 1226, 1238 (M.D. Ala. 2015) (applying Rule 6 to computing one-year time period for well-settled defense because "[t]he Hague Convention itself is silent on computational methodology, but Rule 6 . . . , which governs the procedures in this court, establishes a default method for computing time when a particular method is not specified in a statute"); *cf. Day v. Morgenthau*, 909 F.2d 75, 78 (2d Cir. 1990), *as amended on reh'g*, (Aug. 29, 1990) (applying Rule 6 and holding section 1983 claim timely).

The Court accordingly finds that Swett's Petition was filed more than one year after the date of wrongful retention.[28] The Court therefore proceeds to consider the well-settled defense.

### 2.    Assessment of Whether S.B.S. Is Well-Settled

Although Article 12 does not define the term "settled," courts have interpreted it to ask whether "the child is in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects." *In re Lozano*, 809 F. Supp. 2d at 230 (*quoting In re Koc*, 181 F. Supp. 2d 136, 152 (E.D.N.Y. 2001)). "'[S]ettled' should be viewed to mean that the child has significant emotional and physical connections demonstrating security, stability, and permanence in [a] new environment." *Lozano v. Alvarez*, 697 F.3d 41, 56 (2d Cir. 2012). In making this determination, "a court may consider any factor relevant to a child's connection to his living arrangement." *Id.* A non-exhaustive list of facts courts consider

---

[28] The record does not make clear why Swett did not file the Petition sooner, on a date that would have blocked Bowe from pursuing a well-settled defense. Swett retained U.S. counsel with Hague Convention expertise, but, she testified, she terminated him in October 2023 based on his legal advice. *See* Tr. 698, 729; *cf.* Tr. 865. In a recorded call with S.B.S. on February 4, 2024—19 days before she filed the Petition—Swett appeared to admit that not filing a Petition within a year of Bowe's wrongful retention had been a deliberate decision, which she made to enable S.B.S. to try out living in New York City. *See* RX-58 at 4 (Swett, stating that "[t]hey sent me a notice saying this needs to be done before a year goes by"; that she chose during that year not to "come over to get you . . . so that you give living there a try"; and that now "the time limit has expired"); Tr. 715–16 (Swett).

in assessing the "settled" defense include: " (1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church [or participates in other community or extracurricular school activities] regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent." *Id.* at 57. This defense must be proved by "a preponderance of the evidence." 22 U.S.C. § 9003(e)(2).

As the following factor-by-factor evaluation below reflects, the evidence overwhelmingly shows that S.B.S. today lives a predictable, comfortable, and fulfilling life in New York, where he has forged meaningful connections with family, friends, and a community. As S.B.S. has stated, the centerpiece of his life is his father, with whom he shares a deep connection. S.B.S. Summary ¶ 4. Bowe's presence in S.B.S.'s life, as the primary caretaker, has given S.B.S. a baseline level of security and predictability that he was missing in Chile. In New York, S.B.S. states, he "feels comfortable, understood, safe, loved, and 'normal.'" *Id.* S.B.S. feels that he can openly share his feelings with Bowe; that Bowe listens to him and "protect[s]" him; and that Bowe has S.B.S.'s best interests at heart. *Id.* Beyond this, S.B.S., with Bowe's help, has built a happy and interesting life in New York over the past 16 months. S.B.S. is flourishing—socially, academically, and emotionally. He has taken advantage of opportunities to grow intellectually in school. He is motivated to learn and actively challenges himself. *Id.* ¶¶ 13–14. In a relatively short time period, he has made meaningful academic progress—rapidly improving his grades, perfecting his English, and discovering interests in art, drawing, and sports. *Id.* He is coming into his own socially, within a "large and interesting friend group." *Id.* ¶ 8. He no longer feels lonely, isolated, and bored, as he reported feeling in Chile, but is engaged by his friends, extra-

curricular activities, academic interests, and school. Tr. 955 (S.B.S.) ("I feel like I'm part of a community."). The evidence also reflects that, since arriving, S.B.S. has steadily assimilated to life here. All this has occurred at an important stage: he is on the verge of adolescence, and is formulating views on who he is, where he wants to live, and with whom he wants to spend time. The evidence reflects that S.B.S. is enthusiastic about living in New York, wants to continue building a life here, and is desperate not to be ousted and risk losing all he has gained.

a.     Age

"[C]ourts are not in total agreement as to the existence of a correlation between age and degree of settlement." *Broca*, 2013 WL 867276, at *6. When a "child is old enough to form the type of significant attachments to the United States contemplated by the Convention but, for any number of reasons, simply has not," then "the home country could very well be the situs of the child's social and educational development notwithstanding a year's (or longer) separation therefrom." *Id.* But "the age of an older child might cut in favor of a finding of settlement if the child has few relatives, friends, and social involvements in his or her home country, and has them here." *Id.*

S.B.S. is today within two months of turning age 12. In addition to time here during earlier vacations, he has lived uninterruptedly in the United States for the past 16 months. He is old enough to be "acutely aware of [his] surroundings and able to form attachments and connections." *In re D.T.J.*, 956 F. Supp. 2d at 534. During this period, S.B.S. has formed attachments and connections to a community in and around New York City. In and out of school, S.B.S. has made new friends and deepened connections with old ones, like Henry, whom he has known from a young age. Tr. 119 (Bowe). He regularly spends time with family in the United States, including his aunt, who lives in Brooklyn, and his grandmother, whom he has

visited in Minnesota. He has thrived in school. He appears especially close with his fifth-grade teacher, Trauman, who described S.B.S. as precocious, bright, driven, and responsible. Tr. 314.

As S.B.S.'s attachments to the United States have deepened, his ties to friends and family in Chile have attenuated. S.B.S. has not kept in touch with Lautaro, his closest friend in Chile[29]; Morales, his Chilean godfather, who alternatively claimed to have seen S.B.S. "at least twice a week," Tr. 1095, or once every two months, while he lived in Chile[30]; or Emma, a close school friend.[31] S.B.S. states that he did not lose touch with old friends "on purpose," but instead "became very busy with his new life." S.B.S. Summary ¶ 12. The one person S.B.S. regularly calls in Chile is his mother. Tr. 960 (S.B.S.) ("I call her almost every day or I try to every two days.").

Swett argues that S.B.S. is not well-settled because the record indicates that he deeply misses Swett and has complex feelings regarding his separation from her. As support, Swett points to emails, including Bowe's to Sonia on April 29, 2023, in which Bowe wrote: "I can see that [Swett's] absence is a growing problem" and that S.B.S. "misses her." PX-14 at 2; *see also* Tr. 269–70 (Bowe). Undoubtedly, S.B.S. deeply misses Swett—just as he deeply missed Bowe when he lived in Chile. *See* Tr. 926 (S.B.S.) ("It was hard to not have [Bowe] around. I just felt like there was a big part of me missing."). Because Swett and Bowe live far apart, S.B.S.

---

[29] Tr. 918 (S.B.S.) ("[N]othing bad happened between us, but I just felt like I had a new life here and he was doing his own thing in Chile."); Tr. 480 (Sonia Tolosa, Lautaro's mom, testified that Lautaro and S.B.S. "were only able to talk once, and [S.B.S.] took quite a while to answer.").

[30] Tr. 1108 (Morales) ("I haven't been able to have contact with S.B.S. since he came to New York.").

[31] Swett and S.B.S.'s teacher, Alarcon, described Emma as his girlfriend. Tr. 1063 (Alarcon); Tr. 524 (Swett); *see also* Tr. 918 (S.B.S.) ("Emma we called each other for many days and played video games. . . . Once I came here I called her maybe once or twice in the first couple months of being here, but then we just lost touch.").

necessarily has been and will indefinitely be geographically separated at almost all times from one parent, causing sadness regardless of his predominant residence. Enduring one parent's absence during the bulk of the year is unavoidable for S.B.S., as for many subjects of Hague Convention disputes. That S.B.S. misses Swett does not make him other than settled in the United States, any more than his missing Bowe made him other than settled earlier in Chile. Indeed, S.B.S., who expressed mixed feelings about his mother in his interview as he had in his writings while in Chile, stated that he had adapted somewhat to her absence. Although stating that he missed Swett, he was "glad [to be] away from Chile," and content that "she wasn't [his] main parent and that [he] didn't have to rely on her anymore." Tr. 979; *see* S.B.S. Summary ¶ 3 ("S.B.S. loves his mother, but there were problems when he lived with her in Chile, and he does not want to go back there, even to visit. . . . S.B.S. does not want to hurt his mother's feelings, but he desperately does not want to return to Chile, or to live with his mother.").

With the significant exception of Swett, the evidence supports that the vast majority of S.B.S.'s meaningful relationships today are here in the United States. This first factor favors the "well-settled" defense. *See Taveras*, 22 F. Supp. 3d at 237 (S.D.N.Y. 2014) (finding 8-year-old child, who had spent 15 months in the United States, well-settled); *In re Lozano*, 809 F. Supp. 2d at 230–32 (finding 5-year-old child, who had spent 16 months in the United States, well-settled); *Gwiazdowski v. Gwiazdowski*, No. 14 Civ. 1482 (FB) (RER), 2015 WL 1514436, at *4–5 (E.D.N.Y. 2015) (finding 8- and 10-year old children "old enough to form meaningful attachments to their new environment").

#### b. *Stability of environment*

"In considering the stability of the children's residence, courts consider the number of homes they have lived in, the permanence of their residence, and the strength of their community

and family ties." *Lomanto*, 2023 WL 4118124, at \*15 (citing *D.T.J.*, 956 F. Supp. 2d at 535).
S.B.S. has lived in the same home his entire time in the United States. He lives with his father in
a walk-up studio apartment in the West Village. Tr. 877–78. There is no indication that Bowe
plans to move anytime soon. Although small, the apartment is a stable and permanent living
environment for S.B.S. He does his homework at the "partners' desk" that he shares with his
father, Tr. 878; he helps his father prepare for and clean up after meals in the kitchen, Tr. 965;
and he spends time in the apartment, watching movies, reading, drawing, and playing games, Tr.
881, 965. Across the street is Horatio Park, where S.B.S. regularly plays with friends, and rides
bikes and skates with his father. Tr. 878, 976; S.B.S. Summary ¶ 4. The apartment is a short
walk from school; S.B.S., whom Bowe has given increased independence, sometimes walks to
school on his own, or home from school with a friend who lives nearby. Tr. 963. S.B.S. feels
his "life is much more predictable" in New York because "[h]e knows what to expect from day
to day." S.B.S. Summary ¶ 25.

Swett counters by arguing that Bowe is unequipped for raising a child as a single parent
with primary custody. She relies on emails in which Bowe acknowledged the burdens of, and
precariousness he felt in, this role. On April 29, 2023, for instance, Bowe wrote Sonia that
S.B.S. suddenly went from having "1.25 parents to like, 1/3 of a parent." PX-14 at 2. On
August 30, 2023, Bowe wrote Dr. Attie: "We need money, space, community, family, structure,
and basically have none of them on a steady basis—yet." PX-24 at 2. These statements do not
bear the weight Swett puts on them. On the contrary, they reflect Bowe's clear-eyed recognition
of his heightened responsibilities and the challenges of meeting S.B.S.'s needs while maintaining
gainful employment, and a welcome dose of humility. The overall record overwhelmingly
reflects, in fact, that Bowe has risen to the challenges of parenthood, and has created a steady,

structured, and predictable life for S.B.S. in the United States. S.B.S. testified that he "feel[s] safe" in his home with Bowe in New York City and that his "life is a lot more stable than it used to be." Tr. 955. His "dad looks out for [him]" and that "[Bowe] makes sure [they're] on the same page and that [S.B.S.] feel[s] okay with what's happening." Tr. 956 (S.B.S.). S.B.S. "feels appreciated and protected by his father." S.B.S. Summary ¶ 4.

S.B.S.'s life in New York with his father as the primary caregiver is by all accounts a happy one. He has a stable and comfortable home environment, a challenging and supportive school, and a substantial community of family and friends. This finding goes far in bolstering the well-settled defense. *See, e.g.*, *In re Lozano*, 809 F. Supp. 2d at 231 (factor supports well-settled defense where child "had been living in one place for sixteen months"); *Matovski*, 2007 WL 2600862, at *14 (factor supports well-settled finding because the "children live in a stable environment; they have lived in the same home since arriving in New York, and there is no evidence that this will change soon"); *Lomanto*, 2023 WL 4118124, at *15 (factor consistent with well-settled defense even where children lived in a single-family apartment in a domestic violence shelter); *Taveras*, 22 F. Supp. 3d at 237 (factor strongly favors well-settled finding where child "has lived in the same apartment, with the same family members (her father and grandmother), and has attended the same school"); *D.T.J.*, 956 F. Supp. 2d at 535 (factor played significant role in well-settled finding where child presented as extremely content with her living situation and had remained in one home in the United States).

        *c.*     *School attendance*

By all accounts, S.B.S. has thrived academically in New York. He currently attends P.S. 41 as a fifth grader, after completing the tail-end of fourth grade there. His teacher, Trauman, described S.B.S. as a "remarkable" student with near-perfect attendance, who has improved

markedly by virtue of hard work and focus. Tr. 314. She testified that S.B.S. "worked incredibly hard" to where he today exceeds most grade standards and meets others. Tr. 314–15. S.B.S., too, "is very proud of this progress." S.B.S. Summary ¶ 13. He has perfect facility with the English language. Several witnesses described him as "extremely articulate," with the ability to "express himself clearly" verbally and in writing. Tr. 317 (Trauman), Tr. 373 (Daniels), Tr. 1153 (Favaro). The Court was privy to S.B.S.'s communication abilities when it questioned him *in camera.* S.B.S. there presented as direct, mature, thoughtful, and logical, as he recounted his experiences in Chile and New York and ably articulated his preferences and perspectives on various subjects, including where he preferred to live and why.

S.B.S. clearly "love[s]" P.S. 41 and has risen to the heightened academic challenges of his New York City school. S.B.S. Summary ¶ 13. He has developed a particular love of art and drawing. *Id.* After graduating from fifth grade, he plans to attend the Lab School, focused on arts and science. Tr. 973. Thereafter, S.B.S. testified, he is currently taking steps to prepare himself for, and apply to, Hunter Middle School, which captured his imagination after learning of its reputation for academic rigor. As Trauman and S.B.S. testified, S.B.S. alerted immediately after hearing of the program, and, motivated, swung into gear preparing for Hunter's challenging admission process. This has entailed preparing outside of school for an end-of-year state exam that will factor in Hunter's admissions decision. S.B.S. recognizes "the challenge of going to a high achieving middle school, [but] wants to accept that challenge and push himself in school." S.B.S. Summary ¶ 14. He testified that because he did not have available in Chile the same caliber of educational opportunities, he "feel[s] like [he] should try to be the best student [he] can in school." Tr. 972. The Court found admirable S.B.S.'s enthusiasm for school.

In light of the overwhelming evidence that S.B.S. has positively acclimated to school in the United States, this factor strongly supports a finding that S.B.S. is well-settled here. *See, e.g.*, *D.T.J.*, 956 F. Supp. 2d at 535–36 (factor favors well-settled finding because child's "testimony about school was overwhelmingly positive"); *Mohácsi*, 346 F. Supp. 3d at 325 (factor favors well-settled finding because child "enrolled in kindergarten and is excited to attend school"); *Demaj*, 2013 WL 1131418, at *19 (factor favors well-settled finding because children were performing well in school and were involved in many extracurricular activities).

### d.     *Religious attendance or community activities*

S.B.S. does not regularly attend a religious establishment, but he participates in regular extra-curricular activities. In summer 2023, he attended three local summer camps. Tr. 277 (Bowe). During the school year, he currently participates in karate and flag-football. Tr. 305, 307 (Bowe). In New York, S.B.S. appreciates the opportunity to "explore the kinds of activities that interest him." S.B.S. Summary ¶ 16. He has tried basketball, ice skating, roller blading, bike riding, and skiing. *Id.* Through these activities, he has created a diverse set of friends who share his interests. Like Bowe, S.B.S. testified that he feels integrated in New York City and that "[he's] part of a community" here. Tr. 955, 976 (S.B.S.).

As such, this factor supports a finding that S.B.S. is well-settled. *Lomanto*, 2023 WL 4118124, at *16 (factor favors well-settled finding in part because child "participates in extracurricular basketball and a weekend educational program"); *Porretti*, 2019 WL 5587151, at *6 (citing fact that children "travel and attend camp during the summer" and "participate in myriad extracurricular activities" as supporting well-settled defense).

e.      *Friends and relatives*

In New York, S.B.S. has a supportive community of friends and family that he sees on a regular basis. He lives near his aunt and his godfather William Clegg. He sees Marisa, who lives in Brooklyn, once every two to three weeks. Tr. 450 (Marisa). He sees Clegg, who lives in Manhattan and has a young daughter that attends P.S. 41 with S.B.S., twice every week. Tr. 423–24 (Clegg). Clegg and Marisa testified to a close relationship with S.B.S. They each take an active role in his life; S.B.S. can depend on them for support. Tr. 431 (Clegg); Tr. 450 (Marisa). Since arriving, S.B.S. has also visited his family in Minnesota, where Sonia and his uncle Kevin live. Tr. 142. His father has also arranged trips to upstate New York to visit family friends, who have young children S.B.S.'s age. Tr. 142.

S.B.S. has also developed a tight-knit group of friends in New York. S.B.S. Summary ¶ 8. S.B.S. is pleased with his growing social circle. Before moving to New York, he did not realize "that it was possible to have like ten friends, which is what [he] ha[s] here." Tr. 891 (S.B.S.). Currently, his friends are divided between those in the "video game group" and the "sporty crowd." S.B.S. Summary ¶ 8; Tr. 971 (S.B.S). He enjoys exploring new activities and interests, and "the ability to explore [] different sides of himself" with different friends. S.B.S. Summary ¶ 8. Because of his involvement in a flag-football league, he has recently spent more time with the "sporty kids." *Id.* In the interview, S.B.S. projected as content and proud of the relationships he has developed in and out of school.

S.B.S. has, no doubt, created deep social connections in the United States as part of a broader community. Tr. 955, 976 (S.B.S.). This factor strongly supports that he is settled in the United States. *Porretti*, 2019 WL 5587151, at *6 (factor supports settled finding because the "children have developed a cohesive network of friends and family in the United States");

*Lomanto*, 2023 WL 4118124, at \*16 (factor strongly supports settled finding because children "have developed strong friendships and networks in New York").

### f.    *Respondent's employment*

Bowe is a speech and presentation consultant and runs his own business. Tr. 34 (Bowe). He is also a freelance writer, having published several books and authored articles that have run in magazines, including *The New Yorker* and *The New York Times Magazine*. Tr. 34 (Bowe). In the last few years, his gross annual income ranged from $105,000 to $123,000. Tr. 139 (Bowe). This compensation is sufficient to give S.B.S. financial stability, provided that S.B.S. continues to attend public schools. Bowe also has shown he can borrow family funds if necessary.[32] The Court thus finds that Bowe has consistent employment, and a family network who can provide temporary financial support to help him weather financial emergencies. *See, e.g.*, *Taveras*, 22 F. Supp. 3d at 238 (finding factor to support well-settled defense even though respondent had a yearly salary of $11,000); *In re Lozano*, 809 F. Supp. 2d at 231 (S.D.N.Y. 2011) (finding factor consistent with well-settled defense even though "Respondent is unemployed and she and the child are entirely dependent on Respondent's sister . . . for financial support"); *Arboleda v. Arenas*, 311 F. Supp. 2d 336, 343 (E.D.N.Y. 2004) (finding factor to support well-settled defense because respondent had "stable employment in the area as a carpenter").

### g.    *Immigration status*

Bowe and S.B.S. are U.S. citizens. This status favors finding a child well-settled. *See Lozano*, 697 F.3d at 57–58 (immigration status an appropriate consideration in "well-settled"

---

[32] Bowe has recently borrowed roughly $100,000 from Marisa, Tr. 302–03 (Bowe), but these funds were used to cover Bowe's legal fees, not recurrent costs. Tr. 461 (Marisa); Tr. 310 (Bowe). The Court does not credit Swett's argument that Bowe borrowed to finance an unsustainable "fun parent" lifestyle, to curry favor with S.B.S. while this litigation pends.

inquiry because it affects how long the child will be able to stay in United States and whether

child will be entitled to certain government benefits); *Taveras*, 22 F. Supp. 3d at 238 (fact that

respondent and child are legal permanent residents favors a finding that child is well-settled).

h.   *Overall assessment*

The foregoing "well-settled" factors all point in same direction.  Considering these

together, Bowe has easily established this defense by a preponderance of the evidence.  Indeed,

he has shown by far more that S.B.S. today has a comfortable, happy, and stable—financially,

emotionally, physically, and legally—life in the United States.  Having spent several hours

interviewing S.B.S.; having heard testimony from his teacher, school counselor, father, relatives,

and family friends; and having reviewed documentary evidence of his ties to his friends in the

United States, his schoolwork, and report cards, the Court is left with a firm impression that

S.B.S. is thriving and well-settled in the United States.  *See, e.g.*, *Porretti*, 2019 WL 5587151, at

\*6 (finding that children have "reached the point at which [they have] become so settled in

[their] new environment that repatriation is not in [their] best interest[s]"); *Demaj*, 2013 WL

1131418, at \*24 (finding that the "totality of the circumstances" demonstrate that "the children's

lives reflect stability in their family, educational, social and most importantly, home life"

(internal quotation marks omitted)).

### D.   Grave Risk of Harm Affirmative Defense

Although finding for Bowe on the above two affirmative defenses, for completeness, the

Court considers the grave risk defense.  Under Article 13(b) of the Convention, return of an

abducted child is not required if "[t]here is a grave risk that . . . return would expose the child to

physical or psychological harm or otherwise place the child in an intolerable situation."  A

84

respondent must establish this defense by "clear and convincing evidence."  22 U.S.C.

§ 9003(e)(2)(A).

Bowe argues that S.B.S., if returned to Chile, would be at grave risk of psychological

harm occasioned by Swett's purported neglect, lack of attention to his needs, and habit of leaving

him in the care of generally short-tenured nannies and with limited out-of-school access to peers.

Bowe raises the specter that S.B.S., if returned, would be suicidal.  Swett disputes the claim that

harm on any such scale would ensue.  She downplays S.B.S.'s unhappiness in Chile in late 2022.

She argues that Bowe's negative influence was largely responsible for any such downward

trajectory in S.B.S.'s mental health.  Further, she argues that, were S.B.S. returned to Chile,

various ameliorative measures—including regular sessions with a therapist, private tutoring, and

expanded access to extracurricular activities—would reduce the emotional turbulence that S.B.S.

experienced in Chile in 2022.

The Court does not find this defense established.  To be sure, Swett understates S.B.S.'s

distress in Chile, and blames Bowe for it, when in fact that distress was real and rooted in aspects

of S.B.S.'s life in Chile for which Bowe was not responsible.  But, critically, Bowe, in pursuing

this defense, overstates S.B.S.'s trauma and the prospects of its resumption on return.  He has not

established by clear and convincing evidence that, back in Chile, S.B.S. would be exposed to a

grave risk of harm.

### 1.    Applicable Legal Standards

To qualify as a grave risk of harm, "[t]he potential harm to the child must be severe, and

the level of risk and danger" associated with that harm must also be "very high."  *Souratgar v.*

*Lee*, 720 F.3d 96, 103 (2d Cir. 2013) (cleaned up).  "[A] 'grave risk' of harm does not exist when

repatriation 'might cause inconvenience or hardship, eliminate certain educational or economic

opportunities, or not comport with the child's preferences.'"  *Ermini v. Vittori*, 758 F.3d 153, 164

(2d Cir. 2014) (quoting *Blondin v. Dubois* ("*Blondin IV*"), 238 F.3d 153, 162 (2d Cir. 2001)). Nor does such a risk exist based on the "adjustment problems that would attend the relocation of most children." *Blondin IV*, 238 F.3d at 165 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996) (emphasis omitted)). A grave risk arises only (1) "where returning the child means sending him to a zone of war, famine, or disease," or (2) "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Id.* at 162 (quoting *Friedrich*, 78 F.3d at 1068). The "grave risk exception is to be interpreted narrowly, lest it swallow the rule." *Souratgar*, 720 F.3d at 103. "It is not relevant to this Convention exception who is the better parent in the long run." *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995).

If a court finds that return poses a grave risk to the child, it may then take into "account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation." *Blondin v. Dubois* ("*Blondin II*"), 189 F.3d 240, 248–49 (2d Cir. 1999); *see also Golan*, 596 U.S. at 677 ("The question whether there is a grave risk . . . is separate from the question whether there are ameliorative measures that could mitigate that risk.").

> ### 2.    Application

The Court begins by assessing S.B.S.'s mental state during his final six months in Chile, when the record reflects a slump in his affect and the emergence of troubling behavior patterns.

On the sensible assumption that past may prove prologue, both parties' analyses of the grave risk defense begin with their portraits—which starkly differ—of the extent of S.B.S.'s distress during that period. In Bowe's account, S.B.S.'s mental health deteriorated rapidly after he left Chile in May 2022. Tr. 46 (S.B.S. was "despondent," "crying and sullen and sort of flat

lining," often "talking about killing himself or hurting himself or wanting to die"). He attributes S.B.S.'s depression to his loneliness, his actress mother's frequent absence and inattention, his having been left in the care of a shifting series of nannies, and the uninspiring schooling he received at CPE. In Swett's account, S.B.S.'s mental health declined in September 2022, but not nearly to the extent Bowe depicts, Tr. 855, and for different reasons. She attributes this slump largely to S.B.S.'s "dependence on the screen"—his habit of talking, sometimes for hours per day, to Bowe over Skype. Tr. 859.

　　As the Court explained in recounting the facts, there is a degree of truth, and a degree of over- or under-statement, to each parent's account. Most fundamentally, Bowe is correct that S.B.S. was deeply unhappy in his final months in Chile. In that period, S.B.S. frequently wrote Bowe—in increasingly desperate terms—to complain about his isolation and loneliness. *See, e.g.*, PX-4 at JB-1002 (Aug. 12, 2022) (S.B.S.: "iv'e had a shit day but im ok"); *id.* at JB-927 (Aug. 31, 2022) (S.B.S.: "anyway i got nobody to talk to and nothing to do."); *id.* at JB-893 (Sept. 11, 2022) (S.B.S.: "fucking life here sucks donkey dick with rancid cheese."); *id.* at JB-861 (Oct. 3, 2022) (S.B.S.: "sorry that i just complained and complained"); *id.* at JB-726 (Nov. 26, 2022) (Bowe consoles S.B.S. for having "a sad afternoon"); *id.* at JB-714 (Nov. 30, 2022) (S.B.S.: "Sorry, im just in a motherfucking bad mood. Cause the fucking dumbass devil is making my life a shit hole."). The Court is unprepared to find that the formidable volume of messages that 10-year-old S.B.S. authored, narrating in real time his torment and alienation, were contrived. On the contrary, the Court found S.B.S.'s testimony credible that he often felt "really depressed," Tr. 934, and was "in a low mood most of the time," due to his loneliness and the absence of his more engaged parent, his father, Tr. 942; *see also* Tr. 951, 956 (S.B.S.) ("The constant moping, hurting myself, asking my mom to sign me up for things, or let me be with my

friends, saying that I miss my dad . . . . [But s]he [still] couldn't tell I was unhappy. And even without me giving her signs, it was concerning that she by herself didn't even think maybe I should sign him up for things, maybe I should let him hang out with friends."). S.B.S. confided these feelings in his early sessions with his New York psychologist, Dr. Attie, who did not find reason to discredit S.B.S.'s accounts of his recent months in Chile. *See* Tr. 758; *see also* PX-12 (treating notes).

Contemporaneous writings are corroborative. On September 25, 2022, Bowe, alarmed by his son's despondence, wrote Swett to urge in strong terms that S.B.S. receive therapy. He wrote: "[Y]ou know that last time, when I left, [S.B.S.] was very, very sad. Cried almost every day for weeks, was very depressed and talked about harming himself. Said he wanted to die, wanted to commit suicide. Very serious." RX-14 at 1. Swett's response adopted Bowe's account in its entirety: "[S.B.S.] did tell me all this about his pain and suffering. He told me about everything you're telling me." *Id.* Swett's response captured her real-time appreciation of the depth of S.B.S.'s unhappiness. The Court credits Swett's claim to have genuinely believed, with some validity, that her son's dependency on and buddy-relationship with Bowe—with the two speaking or texting for hours—had contributed to his alienation from peers and disdain for Chile. Swett testified to this perception. *See* Tr. 859 ("I realized that S.B.S. needed a therapist in September. It's related to especially related to the fact that S.B.S. was developing a dependence on the screen and forgetting about the rest of his life."). And she chronicled this belief in emails asking Bowe to cut back his Skype time with S.B.S. *See* RX-14 at 3 (Sept. 25, 2022) (Swett to Bowe: "His daily calls with you are not doing him good. We'll need to schedule them with the therapist's guidance.").

Further evidence that S.B.S. was suffering in late 2022 are the contemporaneous notes of Dr. Valenzuela, the therapist Bowe arranged for him to see during a visit to Santiago. Following their one session, on November 4, 2022, Dr. Valenzuela recorded that S.B.S. stated that "loneliness bothers me," and that "I feel I don't matter to anybody." PX-10 at 2. Final evidence of S.B.S.'s anguish is his act of self-harm—deliberately scratching his arm with his long fingernails while in a school bathroom and then reporting this to Swett as an act of frustration. That act, Dr. Attie persuasively opined, bespoke reflected genuine "despair." Tr. 764.

It is hard to avoid the conclusion that S.B.S., whose unhappiness, and need for attention and help, were vividly on display during this period, deserved a better response than he received from the adults in his life, including his on-scene parent, Swett. Tr. 859 (Swett) (admitting that "S.B.S. needed a therapist in September [2022]" but never taking him to one). Fatal to Bowe's grave-risk defense, however, the assembled evidence falls short of establishing any condition worse than depression. In particular, the Court rejects that S.B.S. was ever actually suicidal—the basis on which Bowe has claimed that a return to Chile would present a grave risk to his son. Bowe testified that S.B.S. had in fact been suicidal in Chile, as shown by what he termed S.B.S.'s constant references to taking his life. Bowe dated S.B.S.'s statements to this effect to Bowe's departure from Chile in May 2022. *See, e.g.*, Tr. 154 ("From the moment that he started just being so despondent and suicidal and talking about death, death, death, everything else in my life just stopped. . . . What's the way you save your kid who's suicidal who lives 5100 miles away?"); Tr. 225 ("I wanted to protect my son . . . who was talking about suicide constantly."); *see also* Tr. 46. Bowe had made the same claim to the New York family court in seeking full custody in May 2023. PX-3 at 2–3 ("After [my May 2022] visit, during our daily Skype chats, [S.B.S.] began to sob and speak nearly every day about killing himself and wanting to die.").

Bowe also testified that, according to S.B.S., S.B.S. had told a teacher in Chile that he was "suicidal and depressed," but that the teacher refused to help him. Tr. 166.

Bowe's account of an actually suicidal child, the Court finds, is highly overstated. The Court finds that, from time to time with Bowe, S.B.S. used expressions evocative of suicide, as he did in one written Skype exchange. *See* PX-4 at JB-1070 (July 1, 2022) (S.B.S.: "im gonna kill myself y swear."). Bowe testified to the fact that S.B.S. made such statements; and Bowe's September 25, 2022 email to Swett is a memorialization that S.B.S. had "[s]aid he wanted to die, wanted to commit suicide." RX-14 at 2. But Bowe's depiction of these statements as occurring daily is not credible. No evidence corroborates it. S.B.S. testified that he had so stated to Bowe only once. Tr. 938. And no other person attested to hearing such a statement; Bowe did not call the Chilean teacher whom he stated had heard but ignored S.B.S.'s expression of suicidal intent. And the evidence supports that S.B.S.'s statements to this effect were hyperbole—words that captured a child's unhappiness but did not bespeak suicidal intent. Bowe acknowledged that S.B.S.'s one writing to this effect—via Skype on July 1, 2022—was "just him being a kid and being dramatic." Tr. 69–70. And S.B.S. admitted to the Court that he never thought about taking any steps to kill himself, because he "knew" that, if need be, Bowe "would come" to Chile and "bring [him] to the United States." Tr. 939. S.B.S.'s affect in testifying on this difficult subject was consistent with a child—age 10 in late 2022—who had used such locutions for the purpose of emphasis only.

The records of S.B.S.'s visits to therapists do not support a child at risk of suicide. Dr. Valenzuela's notes do not refer to suicidal ideation; to the contrary, they include statements from S.B.S. that he "has a good time at school and sometimes with his mom." PX-10 at 3. And Dr. Attie did not chronicle or attest to a risk of suicide—or that S.B.S. had any clearly diagnosable

mental health condition. Rather, she assessed that S.B.S. had been "unhappy for a long time," and in late 2022 might have experienced a "depressive episode," Tr. 1010–11. In her view, that S.B.S. engaged in an act of self-harm—having bloodied his arm with his fingernails—reflected "despair," Tr. 764, and an "enduring unhappiness," Tr. 1011, but not that he wanted to die, or that he would have committed further self-harm, Tr. 768–69; *see also* Tr. 1234, 1270–71 (Favaro) (S.B.S.'s self-harm a cause for concern, but did not reflect suicidal ideation). This conclusion accords with S.B.S.'s testimony that he scratched himself from "[f]rustration about not being with my dad," not from a desire to kill himself. Tr. 937.

S.B.S.'s real-time writings also favor a more nuanced portrait of his life and mental state in Chile during late 2022 than Bowe's dystopian account. S.B.S. recounted some gatherings with friends, including his best friend, Lautaro. *See, e.g.*, PX-4 at JB-885 (Sept. 15, 2022) (S.B.S. tells Bowe that he's "at Lautaro's hood" so he doesn't "think we'll talk today but i'll 100% see u tomorrow"); *id.* at JB-785 (Oct. 28, 2022) (S.B.S. tells Bowe that he will play "roblox, and maybe hanging out w lautaro"); *id.* at JB-778 (Oct. 31, 2022) (S.B.S. tells Bowe that he's "going to pedro's house for Halloween, its gonna be me, lautaro, and pedro...[a]nd hopefully luciano"). He also reported some recreational activities with Swett. *See, e.g.*, JB-944 (Aug. 26, 2022) (S.B.S. tells Bowe that he's going to "go watch a movie with mah mommah," so he won't be able to speak with him). Bowe's bleak account of S.B.S.'s school in Chile was also overstated. The testimony was undisputed that S.B.S.'s class size was huge (45) and included an autistic child prone to disruption. *See, e.g.*, Tr. 1072, 1076 (Alarcon). But the school had redeeming qualities. Teacher Alarcon testified that the school is ranked as one of Chile's top 50 schools, Tr. 1073–74, and that S.B.S. was a "very good student," "among the best in his class," Tr. 1090. Also inconsistent with the portrait of a loner suffering in silence, S.B.S., in his final

year in Chile, was elected fifth grade class president by his classmates, besting 10 rivals—a measure of his popularity, attendance, and behavior. Tr. 1086 (Alarcon). S.B.S. himself testified that although school "always felt kind of unsupervised," he never felt unsafe or as if "anything bad was going to happen" to him there. Tr. 915.

In sum, in light of this record, the Court cannot find that S.B.S. was at grave risk of harm as of December 2022, when he left Chile for the last time. Simply put, he was depressed and lonely. Bowe was justified in his worry about this, and warranted in pressing Swett to agree to therapy for a 10-year-old he saw as "very, very sad." RX-14 at 1. But S.B.S.'s circumstances fall far short of establishing, in severity or likelihood, the "grave risk" of psychological harm required by the Convention. *See Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) (to find clear and convincing evidence, a court must be left with "no substantial doubt").

This case is thus a far cry from those in which this defense has been established. In the vast majority of cases finding a grave risk of harm based in part on a child's mental health, there has been compelling evidence of abuse by the custodial parent. *See, e.g.*, *Simcox v. Simcox*, 511 F.3d 594, 608–09 (6th Cir. 2007) (grave risk of harm where children suffered from post-traumatic stress disorder due to father's "serious" physical and psychological abuse, which included "repeated beatings" and "profane outbursts" directed at the children's mother); *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 408 (E.D.N.Y. 2005) (grave risk of harm where children had experienced physical abuse from father, had witnessed his abuse of their mother, and expert testified that their return to Israel would trigger post-traumatic stress disorders, as well as 14-year-old's suicidal ideations); *Walsh v. Walsh*, 221 F.3d 204, 221–22 (1st Cir. 2000) (grave risk of harm where child diagnosed with post-traumatic stress disorder due to father's "uncontrollably

violent temper" and "clear and long history of spousal abuse"). The record here reflects nothing of the sort.

In a shorter line of cases, a grave risk of harm has been found based on "serious neglect" by the custodial parent. *See Salame v. Tescari*, 29 F.4th 763, 767 (6th Cir. 2022). The evidence here supports that, in 2022, Swett, after her post-pandemic return to work, at times was absent and/or emotionally detached from S.B.S., and did not take action after the depth of her son's unhappiness become apparent. But by the standards of the case law, such falls way short of "serious neglect." In the cases that have so found, the custodial parent entirely disregarded her child's needs or actively facilitated her child's harm. *Compare, e.g.*, *Luis Ischiu v. Gomez Garcia*, 274 F. Supp. 3d 339, 353–54 (D. Md. 2017) (grave risk found where father "condoned" sexual abuse and child suffered from post-traumatic stress disorder and clinical depression as a result), *with, e.g.*, *Galaviz v. Reyes*, 95 F.4th 246, 257–59 (5th Cir. 2024) (grave risk not found despite "unsuitable childcare," children's "poor hygiene," a "lack of educational opportunities," and mother's decision to "obtain[] a 'boob job' instead of continuing therapy for her son"; such considerations are "relevant to custody" but not to the grave risk defense); *Guerrero v. Oliveros*, 119 F. Supp. 3d 894, 913-14 (N.D. Ill. 2015) (grave risk not found despite fact that child "was frequently left unsupervised in the street, had lice, and was often dirty," as such "custody issues are expressly reserved" for home country's courts); *Cuellar v. Joyce*, 596 F.3d 505, 509–10 (9th Cir. 2010) (grave risk not found despite child's "frequent ear infections," "unexplained burns behind her earlobes," and preventable head injury, as Convention does not demand perfection of petitioning parent). This Hague Convention defense is not intended to redress parental lapses of that nature, which are properly taken up in custody litigation. *See Redmond v. Redmond*, 724 F.3d 729, 739 (7th Cir. 2013).

Finally, even if S.B.S.'s mental health as of December 2022 had been sufficiently dire to put the grave risk defense in play, Bowe has not demonstrated that he would comparably suffer today if returned to Chile. For various reasons, that premise does not follow.

By all accounts, prior to mid-2022, S.B.S. had been a content child, and, notwithstanding the challenges presented by geography, his parents had ably co-parented him. S.B.S.'s emotional slump in late 2022 was of relatively short duration. Per the evidence, it began between in mid-2022—some six months before S.B.S. left Chile. And it arose in unique circumstances lending themselves to turbulence. S.B.S. had spent the early pandemic living with his mother in her Tunquén beach house, but, in 2022 upon his return to Santiago, found himself in a new school largely in the care of nannies after Swett, previously sidelined by the pandemic, returned to acting work. Tr. 542–43, 549–50, 553–54 (Swett). In late 2022, S.B.S. was also at an unsettled pre-adolescent age (10).

S.B.S.'s sadness was also accelerated by regrettable behavior patterns by both parents that by no means would recur were he returned to Chile. Swett failed to alert to her son's down mood and resisted arranging for professional treatment, a decision both parties' mental health witnesses sharply criticized at trial.[33] Bowe, for his part, although alerting to the problem, came to respond counterproductively, barraging S.B.S. in his final months in Chile with divisive Skype messages that elevated himself and demeaned Swett, with the effect (and seeming intent) of further alienating S.B.S. from his custodial parent and homeland.

Were S.B.S. returned to Chile, but with these toxic circumstances removed from the equation or diminished, it is very possible that the worst of his depressive symptoms would not

---

[33] Dr. Attie termed the failure to retain a therapist for S.B.S. an act of negligence. Tr. 1014. Dr. Favaro termed that decision neglectful. Tr. 1303.

return with him. *See Gaudin v. Remis*, 415 F.3d 1028, 1037 (9th Cir. 2005) (examining whether, upon return, child would experience grave harm in "immediate future," and finding not). Courts examining claims of a grave risk upon return have inquired whether the harm to the child arose from a "sustained pattern" of conduct, rather than "[s]poradic or isolated incidents," *Souratgar*, 720 F.3d at 104 (citation omitted), as a means to test the gravity and likelihood of recurrence of the claimed harm. *See Galaviz*, 95 F.4th at 256; *see also, e.g.*, *In re Filipczak*, 838 F. Supp. 2d 174, 180 (S.D.N.Y. 2011) (grave risk of harm not found despite single incident in which child witnessed severe spousal abuse); *McManus v. McManus*, 354 F. Supp. 2d 62, 69–70 (D. Mass. 2005) (grave risk of harm not found despite two incidents in which mother struck two of her four children and despite a generally chaotic home environment). Here, although S.B.S. undeniably was "desperately lonely" and "isolated," Tr. 758 (Attie), and "really missed his father," Tr. 603 (Swett), in his final months in Chile, and although S.B.S.'s reasoned objections to return merit weight in connection with the Article 13 age and maturity defense addressed above, the record does not establish that, with therapy and a return to constructive co-parenting, he would be at grave risk of descending into despondency so dire as to qualify as severe harm.

In sum, Bowe has not established by clear and convincing evidence that S.B.S. would be at a grave risk of harm if returned to Chile. And, the Court finds, were such a risk found, the reasonable ameliorative measures that Swett has proposed—including mental health treatment, private tutoring, and access to extracurricular activities[34]—would, if coupled with a return to competent co-parenting, ensure S.B.S.'s "physical and psychological safety." *Golan*, 595 U.S. at

---

[34] Swett's proposed ameliorative measures largely accord with those that Bowe proposed when pressed by the Court at trial, Tr. 308, and those that S.B.S. suggested when asked how his life in Chile could have been improved—"to hang out with kids" more and "to have more activities" after school, Tr. 936.

680; *see also, e.g., Rial v. Rijo*, No. 10 Civ. 1578 (RJH), 2010 WL 1643995, at *3 (S.D.N.Y. Apr. 23, 2010) ("Even when a grave risk of harm is not present, . . . undertakings [can] be used to ensure that a potential harm does not manifest when a child returns to his or her country of habitual residence.").[35]

The Court thus concludes that, although Bowe has established the other two defenses, he has not established the grave risk defense, let alone by clear and convincing evidence.

### E.    Discretionary Return

A final issue is whether—notwithstanding that two affirmative defenses to return have been established—the Court should exercise equitable discretion to order S.B.S.'s return to Chile. The Court declines to do so.

### 1.    Applicable Legal Standards

"[W]hen a child has been wrongfully removed or retained from his country of habitual residence, Article 12 of the Hague Convention generally requires the deciding authority (here, a district court) to order the return of the child." *Golan*, 596 U.S. at 676 (cleaned up). That follows from the Convention's "core premise" that "'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky*, 140 S. Ct. at 723 (alteration in original). "Return of the child is, however, a general rule, and there are exceptions," *Golan*, 596 U.S. at 670, including where an affirmative defense has been established. In such a circumstance, the Court is not required to

---

[35] This case is easily distinguished from those in which ameliorative measures have been found unworkable, either due to the custodial parent's violent tendencies, *see, e.g., Davies*, 717 F. App'x at 49 (measures unworkable due to petitioner's "escalating threats toward [respondent] even after their separation" and past pattern of domestic abuse), or likely refusal to comply, *see, e.g., Walsh*, 221 F.3d at 221 (1st Cir. 2000) (measures unworkable due to petitioner's "history of violating orders issued by any court"). Based on the record including Swett's testimony, the Court is confident that, were S.B.S. returned to Chile, Swett—a loving mother—would act energetically to regain S.B.S.'s affections and attend to his happiness.

order the child's return, as the Convention would otherwise require. *See id.* at 676; *Blondin IV*, 238 F.3d at 164–65.

As the Supreme Court has recognized, however, the Convention, "[b]y providing that a court is not *bound* to order return," does not *forbid* return. *Golan*, 596 U.S. at 676 (emphasis added). Establishing a defense merely "lifts the Convention's return requirement, leaving a court with the discretion to grant or deny return." *Id.* Appellate courts have described this discretion as equitable in nature. *See, e.g.*, *Fernandez v. Bailey*, 909 F.3d 353, 361–62 (11th Cir. 2018); *Alcala v. Hernandez*, 826 F.3d 161, 175 (4th Cir. 2016); *Yaman v. Yaman*, 730 F.3d 1, 16 (1st Cir. 2013); *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995); *see also Lozano*, 572 U.S. at 19–21 (Alito, J., concurring).

The case law on this point is sparse, *see da Costa v. de Lima*, 94 F.4th 174, 180 (1st Cir. 2024), but it underscores that discretion to order a child's return in the face of an affirmative defense is limited to exceptional cases. An example of such a rare case is *Fernandez v. Bailey*, 909 F.3d 353 (11th Cir. 2018). The district court there found the twin boys at issue, who had been taken from Panama by their mother, settled in the United States, where they had lived for more than two years before their father petitioned for their return. The Eleventh Circuit upheld that finding, but it nonetheless held that the district court had abused its discretion in failing to order the boys' return, given the mother's egregious conduct. *See id.* at 357–58, 363–66. This was her second violation of the Convention. In an earlier case, she had kidnapped the same boys and brought them to the United States, only to have a federal district court order their return to Panama. *See id.* at 363–64. In addition, the mother had concealed the boys' location after their abduction. It took a private investigator, hired by the father, to find them in Tampa, Florida. *See id.* at 357. And, because of the father's criminal record, he was ineligible to enter the United

States and thus would have been required to litigate any custody issues from abroad, giving the mother a major "home-field advantage." *Id.* at 365. "Given the confluence of the unique facts in this case," the Eleventh Circuit held, it would be "contrary to the aims and objectives of the Convention" not to order the children's return to Panama. *Id.* at 365–66.

A counterexample is *Custodio v. Samillan*, 842 F.3d 1084 (8th Cir. 2016). There, the district court held—and the Eighth Circuit affirmed—that the child had reached sufficient age and maturity for his objections to return to be considered. *See id.* at 1089. On appeal, the father argued that the district court abused its discretion in failing to order return based on the fact that the mother had brazenly lied to the Peruvian courts to enable her to bring the child to the United States, and had since then disobeyed five Peruvian court orders to bring the child home. *See id.* at 1091–92. The Eighth Circuit rejected the father's argument. The mother's actions were "concerning," it stated, but the case did not present egregious facts compelling a court to exercise discretion to order return. *Id.* at 1092. As the Circuit put the point: "[T]he district court's consideration of a mature child's views may but need not be affected by the wrongful actions of his or her parent." *Id.*

There is good reason to limit discretion to overcome a defense to the exceptional case. By nature, any Hague Convention case in which a *prima facie* case has been established involves inequitable conduct—the child's wrongful abduction. *See Alcala*, 826 F.3d at 175 ("[W]rongful removal in itself should [not] lead courts to exercise their retained discretion in the face of an established Convention exception."). And cases in this space are apt to involve wrenching situations, offsetting equities, and factual ambiguity. *Cf. Brown v. Ives*, 129 F.3d 209, 213 (1st Cir. 1997) ("Family issues, including abuse and custody, are among the most difficult for the law to resolve. Standards tend to be vague, situations may be wrenching, and the legal tools at hand

are often clumsy."). As the Supreme Court has held in construing the Parental Kidnapping Prevention Act of 1980, a statute governing interstate abduction, federal courts are not to "play Solomon" or become entangled with "traditional state-law questions" regarding parents' virtues and vices "that they have little expertise to resolve." *Thompson v. Thompson*, 484 U.S. 174, 186 (1988).

The Convention's design also underscores that although its purpose "is to deter parents from absconding with their children," *e.g.*, *Tann v. Bennett*, 807 F.3d 51, 53 (2d Cir. 2015), it "does not pursue return exclusively or at all costs," *Golan*, 596 U.S. at 679; *cf. Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam) ("[I]t frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law."). The Convention's affirmative defenses reflect a recognition that the "countervailing interests" of a child—including in stability and in having a voice where to live pending a final determination of custody—may support his staying put notwithstanding the removing parent's breach. *Blondin IV*, 238 F.3d at 161. In short, these defenses recognize that "children should not be made to suffer for the sake of general deterrence of the evil of child abduction world wide." *Lozano*, 572 U.S. at 16–17 (quoting *In re M* [2008] 1 A.C. 1288, 1310 (Eng. 2007) (opinion of Baroness Hale of Richmond)). "Discretion is not whim," *Golan*, 596 U.S. at 679 (citation omitted), and "an overly broad construction" of authority to order discretionary return would "frustrate" important Convention goals, namely, to recognize children's interest in repose and stability, to incent non-abducting parents to bring petitions promptly, and to establish clear and administrable rules facilitating the efficient resolution of Convention cases. *Blondin IV*, 189 F.3d at 246; *see also In re B. Del C.S.B.*, 559 F.3d 999, 1016 (9th Cir. 2009). Exercising broad-ranging equitable discretion to override statutory defenses

would also disrespect a district court's finite role under the Convention: to determine "which country is the proper forum" for custodial issues to be resolved, not to resolve such issues. *Koch v. Koch*, 450 F.3d 703, 711 (7th Cir. 2006).

### 2. Application

Measured against these standards, the circumstances of this case do not justify exercising discretion to order S.B.S.'s return.

In urging as much, Swett emphasizes Bowe's sustained demonization of her to S.B.S. during the child's final months in Chile, as memorialized in Skype messages in which Bowe called her, among other invective, a "fucking idiot," PX-4 at JB-776, "insane," *id.* at JB-1073, and "too drugged out and stupid to even write me back," *id.* at JB-770. These communications, she argues, not only demeaned her to S.B.S. but alienated him from life in Chile, thus skewing in Bowe's favor the two defenses the Court has found established here.

It is beyond argument that Bowe's divisive messages were, as Dr. Favaro testified, "extremely and egregiously toxic." Tr. 1171. Bowe himself repudiated them at trial, Tr. 53, 61, 170, 195, and conceded that they had the capacity to undermine S.B.S.'s views of his mother, Tr. 175–76. No matter how strong Bowe's convictions that Swett's parenting was disserving S.B.S., and that the solution was to rescue S.B.S. from Chile, these insults were indefensible. As S.B.S. poignantly testified, "[i]t felt a little hard to have one parent talk like that about another." Tr. 947. S.B.S. and Swett deserved better.

But, in finding established the two affirmative defenses, the Court has rejected—firmly— that Bowe's messages brought about S.B.S.'s despondency in Chile, as opposed to responding ill-advisedly to it. In finding the defense based on S.B.S.'s objections to return, the Court has respected as independent, authentic, and durable S.B.S.'s mature view to this effect. In finding the defense based on S.B.S.'s being settled, the Court has recognized the overwhelming evidence

of S.B.S.'s successful acclimation to New York. Returning S.B.S. in the face of these defenses would punish Bowe for his missteps, at the price of disserving S.B.S. *See Rodriguez v. Yanez*, 817 F.3d 466, 475 (5th Cir. 2016) (noting Convention's recognition that "wrongfully removed children are not inanimate objects—they are people with agency of their own"); *da Costa*, 94 F.4th at 185–86 (finding that equity would not be served "by ordering the child's departure from a supportive environment and the return to a less supportive one simply as punishment for the removing parent's alleged malfeasance").

Accordingly, the Court finds that the equities overwhelmingly favor S.B.S.'s retention in New York, and declines to exercise its discretion to order his return to Chile. *See Fernandez*, 909 F.3d at 363 ("[A] district court ordering the return of a settled child should be an infrequent occurrence, so as not to swallow the text of Article 12's stated exception.").[36]

---

[36] Although not necessary to this determination, other equitable considerations—beyond those embodied in the affirmative defenses—would weigh against S.B.S.'s return. These include that Bowe's motivation in retaining S.B.S. was benign, *i.e.*, to remove S.B.S. from a deeply unhappy environment; that Swett waited—even by her own account—a year to pursue return, while S.B.S. settled into life in New York; and that Bowe did not conceal S.B.S.'s whereabouts, but instead encouraged S.B.S. to maintain close contact with Swett and encouraged her to visit S.B.S. in New York, Tr. 304 (Bowe). *See, e.g., In re B. Del C.S.B.*, 559 F.3d at 1016 (notwithstanding abducting parent's misconduct, declining to order return where child was settled in new environment and there was no showing of concealment).

**CONCLUSION**

For the reasons stated above, the Court denies the Petition.[37]  The Clerk of Court is

directed to terminate all pending motions and to close this case.[38]


SO ORDERED.

*Paul A. Engelmayer*
_____
PAUL A. ENGELMAYER
United States District Judge

Dated: May 7, 2024
       New York, New York

---

[37] In light of this outcome, S.B.S.'s travel documents, held by the Clerk of the Court, are to be returned to him.  With the petition's denial, the Court's order restricting Bowe from removing S.B.S. from this jurisdiction during this litigation, Dkt. 6, is null.

[38] The Court thanks counsel for the exceptional vigor, skill, and professionalism with which they litigated this challenging, important, and affecting case.  Counsel's efforts were particularly impressive given the compressed period of this litigation—a schedule prompted by the Convention's directive that petitions under it be resolved with expedition.  *See* Hague Convention, art. 11.  To the extent counsel were working pro bono, the Court further commends counsel for their contribution of substantial pro bono time and resources.

The Court specifically wishes to acknowledge (1) Swett's law firm, Friedman Kaplan Seiler Adelman & Robbins LLP, its attorneys Andrew Englander, Jacob Lewis, Caroline McHugh, Lindsay Funk, and Matt Tharp, assisted by Richard Min of Green Kaminer Min & Rockmore LLP, and its support staff, Syreeta Lee, Benjamin Miller, and Jose Rivera; (2) Bowe's law firm, Morvillo Abramowitz Grand Iason & Anello PC, its attorneys Karen King, Kathleen Cassidy, Abbe Ben-David, Jordan Weatherwax, and Megan Knepka, and its support staff, Grace Jang and Yesenia Ruano; and (3) Professor Jennifer Baum, assisted by law students Seth Goldstein and Arthur Rohman, who, at the Court's request, represented S.B.S.  The lawyering in this case was first-rate and a credit to the profession.